No. 74,528

In the Matter of the Application of NINA KAUL for Exemption from Ad Valorem Taxes in Jackson County, Kansas.

933 P.2d 717

Opinion filed March 7, 1997.

*John M. Cassidy*, assistant attorney general, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellants Richard E. Batchellor, Jackson County Appraiser, and the Board of Jackson County Commissioners.

*Michael C. Hayes*, of Oskaloosa, argued the cause and was on the brief for appellee Nina Kaul.

The opinion of the court was delivered by

LOCKETT, J.: The Jackson County Appraiser and the Board of Jackson County Commissioners appeal the Jackson County District Court's affirmance of a Board of Tax Appeals' (BOTA) determination that land within the formal boundaries of the Potawatomi Indian reservation and owned in fee patent by Nina Kaul, an enrolled member of the Citizen Band Potawatomi Tribe, is exempt from imposition of ad valorem property taxes pursuant to § 1 of the 1861 Act for Admission of Kansas into the Union.

## Background

Prior to our analysis of the 1861 Act for the Admission of Kansas into the Union (Act for Admission), it is important to note that the parties, BOTA, and the district court agree that the United States Supreme Court in *County of Yakima v. Confederated Tribes and Bands of Yakima Nation*, 502 U.S. 251, 116 L. Ed. 2d 687, 112 S. Ct. 683 (1992), determined that federal restrictions upon state or county taxation of Indian reservation land owned in fee patent may

be removed. As background for our analysis, it is instructive to review the *Yakima* decision.

In *Yakima*, the county of Yakima, Washington, sought to impose an ad valorem tax on real property and an excise tax on the sale of such property, including "fee-patented" land owned by the Yakima Indian Nation and its members within reservation boundaries. "Patented in fee" refers to Indian land held in fee by the property owner which has no restrictions on alienation (sale), as opposed to Indian land held in trust by the federal government which is not freely alienable. See 502 U.S. at 254-55. An ad valorem tax is a tax imposed on the basis of the value of the article or thing taxed. An excise tax is a tax imposed on the performance of an act, the engaging in an occupation, or the enjoyment of a privilege. See *Callaway v. City of Overland Park*, 211 Kan. 646, 651, 508 P.2d 902 (1973). An excise tax may also refer to a tax on the transfer of property. Black's Law Dictionary 563 (6th ed. 1990).

When Yakima County threatened foreclosure on certain parcels of land for which ad valorem taxes had not been paid, the Yakima Tribe brought suit for declaratory and injunctive relief, contending that federal law prohibited imposition of taxes on such land. The injunction was granted by the federal district court. On appeal, the district court was reversed in part by the Ninth Circuit, which remanded the case to the district court for a determination of whether the state's ad valorem tax had a demonstrably serious impact on the Tribe's political integrity, economic security, or health and welfare. See *Confederated Tribes v. County of Yakima*, 903 F.2d 1207 (9th Cir. 1990). The United States Supreme Court granted *certiorari* and rejected the Ninth Circuit's determination that the ad valorem tax on real property only would be acceptable absent a serious impact. The Supreme Court concluded that, under the .right circumstances, the imposition of ad valorem property taxes was proper while imposition of the excise sales tax was not.

In *Yakima*, 80% of the reservation land was held in trust by the government and 20% was owned in fee by Indians (some by individual Tribe members and some by the Tribe as a whole) and non-Indians due to patents distributed during the late 1880's. The specific property at issue in *Yakima* was fee patented pursuant to

the General Allotment Act of 1887 (GAA), also known as the Dawes Act, 24 Stat. 388, codified as amended, 25 U.S.C. § 331 *et seq.* (1994), which empowered the President to allot most tribal lands nationwide to individual Indians without the consent of the Indian nations involved. The GAA restricted immediate alienation (sale) by providing that each parcel of land would be held in trust for a period of 25 years or longer. 502 U.S. at 254. At that time, a fee patent would issue to the Indian allottee. Section 6 of the Act provided that all Indians who would receive allotments would " 'have the benefit of and be subject to the laws, both civil and criminal of the State or Territory in which they may reside.' " 502 U.S. at 254 (quoting 24 Stat. 390).

Subsequently, the Burke Act of 1906, 34 Stat. 182, decreed that state civil and criminal jurisdiction would only lie " 'at the expiration of the trust period . . . when the lands have been conveyed to the Indians by patent in fee.' " 502 U.S. at 255. A proviso in the Burke Act gave the President authority to issue a patent in fee simple prior to the expiration of the trust period if he found an Indian allottee " 'competent and capable of managing his or her affairs.' " As to a premature fee patenting, the Burke Act proviso did not specify that the patentee would be subject to state criminal or civil jurisdiction, but stated that all restrictions as to sale, incumbrance, or taxation of the land would be removed. 502 U.S. at 255.

In 1934, Congress enacted the Indian Reorganization Act, 48 Stat. 984 (1934), codified in 25 U.S.C. § 461 *et seq.* (1994). This Act halted further allotments and extended indefinitely the existing periods of trust applicable to allotted but not yet fee-patented land. However, Congress did not cancel the prior allotments under the GAA and imposed no restraints upon the ability of Indian allottees to alienate or encumber their allotments.

In reviewing prior cases addressing the issue of "attempts by States to exercise dominion over reservation lands of Indians," the Supreme Court observed that the general principle flowing from the early cases was that state jurisdiction would generally not lie within Indian reservations—including the state's taxing jurisdiction. 502 U.S. at 257. The Supreme Court noted that prior cases

had counseled that a state was without jurisdiction to tax Indians without express Congressional authorization. 502 U.S. at 258.

The Supreme Court found two sources for the authority for the imposition of ad valorem taxes on the Yakima fee-patented property. The first of these was § 6 of the GAA which, as stated previously, provided that when the lands had been conveyed to the Indians in fee patent, each Indian would be subject to the laws of the state or territory, and if the fee patent was granted, all earlier restrictionsas to taxation would be removed. 502 U.S. at 258 n.1.

The Supreme Court then reviewed its prior cases which had declined to impose taxes upon Indian property. The Supreme Court distinguished these prior cases, such as *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 48 L. Ed. 2d 96, 96 S. Ct. 1634 (1976) (holding it improper for Montana to impose taxes on cigarette sales and on personal property, as well as to impose vendor licensing fees), on the grounds that these cases involved an imposition of a state's extension of in personam jurisdiction while *Yakima* involved in rem jurisdiction. 502 U.S. at 261-65. The Supreme Court explained: "While the *in personam* jurisdiction over reservation Indians at issue in *Moe* would have been significantly disruptive of tribal self-government, the mere power to assess and collect tax on a certain real estate is not." 502 U.S. at 265.

The Court found a more significant source of authority for the imposition of ad valorem taxes, based on the character of the allotted lands as freely alienable. 502 U.S. at 263. Citing an earlier decision, *Goudy v. Meath*, 203 U.S. 146, 51 L. Ed. 130, 27 S. Ct. 48 (1906), which held that the GAA authorized taxation of fee-patented land owned by a direct allottee of the GAA, the Court held that because, under state law, liability for the ad valorem tax flowed exclusively from ownership of realty on the annual assessment date and was a burden on the property and not the person, the tax was valid. The Court, quoting from *Goudy*, 203 U.S. at 149, stated: " '[I]t would seem strange to withdraw [the] protection [of the restriction on alienation] and permit the Indian to dispose of his lands as he pleases, while at the same time, releasing it [*sic*] from taxation.' " 502 U.S. at 263.

The Court concluded that because the GAA rendered the allotted lands alienable and encumberable, it had also rendered them subject to assessment and forced sale for taxes. 502 U.S. at 263-64. The Court determined that state imposition of ad valorem taxes was a proper exercise of the state's in rem jurisdiction over alienable unrestricted fee-patented lands within reservation bounds. The Court held the state excise tax invalid, but left for resolution on remand the factual question of whether the parcels of land at issue were patented under the GAA or some other federal allotment statute and the legal question of whether the source of the allotment made any difference to the state's power to assess and collect the tax on the property. 502 U.S. at 266-270.

Kaul fails to address the distinction between the imposition of a tax on fee-patented property and property held in trust and the distinction between in rem and in personam jurisdiction as adopted by the Supreme Court in *Yakima*. Instead, Kaul cites numerous cases, federal and state, in support of her argument against imposition of taxes upon her property. Not one of the cases or other authorities cited deals with in rem jurisdiction to tax fee-patented land. Instead, they deal with in personam civil or criminal jurisdiction over Indians or Indian property or with property held in trust or otherwise restricted.

Since the Supreme Court decided *Yakima*, the lower federal courts have allowed the imposition of ad valorem taxes on fee-patented reservation land even though the fee patent did not derive from the GAA. In *Lummi Indian Tribe v. Whatcom County, Wash.*, 5 F.3d 1355, 1357-59 (9th Cir. 1993), *cert. denied* 512 U.S. 1228 (1994), the Ninth Circuit addressed the amenability to ad valorem taxation of land patented in fee absolute and granted not under the GAA but under a *treaty* with the Lummi Tribe. In 1855, the United States created the Lummi Indian Reservation by the Treaty of Point Elliott and carried out the treaty terms by issuing restricted fee patents in allotments. Of the four parcels at issue in *Lummi*, restrictions on alienation of one parcel were removed at the time it was purchased by a non-Indian. In the 1970's, the Tribe purchased the parcel. The other three parcels were assigned to an Indian who was determined to be competent to transact his own

business, restrictions upon alienation were removed and the parcels were ultimately purchased by the Tribe.

The Ninth Circuit interpreted *Yakima* to stand for the general proposition that no matter how land becomes fee patented, it is taxable once restraints upon alienation expire. 5 F.3d at 1357. Since all the land in question had been approved for alienation by the federal government and then reacquired by the Tribe, the ad valorem tax was valid.

In *U.S. v. State of Mich.*, 882 F. Supp. 659 (E.D. Mich. 1995), the United States and the Saginaw Chippewa Tribe brought an action to contest the levying of ad valorem property taxes upon parcels of land owned individually by members of the Tribe and one parcel owned by the Tribe. The land at issue was originally patented pursuant to treaties of 1855 and 1864 to an individual Indian, James Gruette, granting to him an unrestricted fee simple absolute estate in land. After a lengthy discussion, the Michigan federal district court, agreeing with the Ninth Circuit in *Lummi*, held:

"If land is subject to alienation, then it is subject to taxes. With perfect title, the land enjoys the freedom to be alienated, the responsibility of being taxed, and the vulnerability to encumbrance. Thus, it is not illogical to imply alienability and taxability when a perfect fee-simple absolute estate is created by unrestricted fee-patent." 882 F. Supp. at 677.

*Leech Lake Band of Chippewa Indians v. Cass County*, 908 F. Supp. 689 (D. Minn. 1995), involved the Nelson Act, 25 Stat. 642 (1889), by which the United States conveyed millions of acres of Minnesota reservation land to Indians and non-Indians. Under § 3 of the Nelson Act, allotments to individual Indians were to be made in conformance with the GAA. Some of the land at issue was initially allotted to individual Indians, pursuant to § 3; other parcels were not. All of the land had been bought and sold before becoming reacquired by the Tribe. The Minnesota federal district court determined *Yakima* stood for the proposition that alienability was the "touchstone" of taxability. 908 F. Supp. at 694. Finding authority in § 3 of the Nelson Act, the *Leech* court held that the parcels patented in fee under that section were taxable. The court rejected the Tribe's argument that the land became inalienable

when reacquired by the Tribe pursuant to the Indian Nonintercourse Act, 25 U.S.C. § 177 (1982). The court found that once Congress deemed the land alienable under the GAA, it remained so, even when sold and reacquired by the Tribe and was, therefore, taxable. 908 F. Supp. at 696.

In *Southern Ute Indian Tribe v. Board of County Com'rs*, 855 F. Supp. 1194 (D. Colo. 1994), the tribal land at issue was held by the Tribe in fee and originally patented under the Act of June 15, 1880, 21 Stat. 199, and supplemented by the Act of February 20, 1895, 28 Stat. 677. *Southern Ute* differs from the foregoing cases because the 1880 Act provided for restrictions upon alienation so that the land was still held in trust by the federal government at the time of the passage of the Indian Reorganization Act in 1934.

*Southern Ute* answered in the affirmative the question, left open in *Yakima*, of whether the source of the allotment of the land at issue "makes a difference" to a determination of the propriety of ad valorem taxation. Citing Judge Beezer's dissent in the *Lummi* decision, the *Southern Ute* court found the method of allotment "crucial" under federal Indian law. The court further found that, under *Yakima*, alienability was not the only test for the imposition of ad valorem taxes upon property, but that "unmistakably clear" Congressional intent to do so must be found. 855 F. Supp. at 1200-02. The *Southern Ute* court then turned to an examination of the treaties and laws under which the tribal lands at issue were allotted. The first Congressional enactment was the Act of June 15, 1880. This Act mandated three general prerequisites to the taxation of allotted lands. First, Congress was to enact "the necessary laws" to accomplish the allotment; second, the 25-year trust period had to expire; and third, the President was required to act to remove the restrictions on alienation and taxation. 855 F. Supp. at 1200-01.

Although the first prerequisite was met when Congress passed the Act of February 20, 1895, the *Southern Ute* court found no evidence that the two other necessary prerequisites had occurred. The court held that because the federal government had not met the statutory prerequisites of the treaties involved for taxation of these lands, restrictions upon alienation on these lands still existed when the Indian Reorganization Act extended all existing periods

of trust placed upon Indian lands until otherwise directed by Congress. Therefore, the lands were not amenable to taxation. 855 F. Supp. at 1202.

## Facts

The facts of this case are not disputed. Nina Kaul is an enrolled member of the Citizen Band Potawatomi Indian Tribe. She resides on land located in Jackson County, Kansas, which is within the boundaries of the Potawatomi Indian Reservation. Kaul owns the property in unrestricted fee simple absolute. The property is not held in trust. The record does not indicate the source of the allotment or Kaul's fee patent. As noted earlier, the source of the fee patents of tribal land has figured prominently in the discussion of the ad valorem tax issue in the federal courts.

Jackson County assessed Kaul's real estate for ad valorem taxes. On February 18, 1993, Kaul filed an application for tax exemption, arguing that her property was not amenable to ad valorem assessment by the State of Kansas or any of its taxing subdivisions because (1) the property is part of a reservation set aside to the Citizen Band of the Potawatomi Tribe of American Indians and (2) she is an enrolled member of this Tribe. On December 15, 1993, BOTA converted Kaul's application for tax exemption into a tax grievance matter pursuant to K.S.A. 79-1702. BOTA then found that under the 1861 Act for Admission, the State of Kansas had no jurisdiction to tax Kaul's property and ordered that any assessment of the property be removed from the tax rolls of Jackson County.

In reaching this conclusion, BOTA relied on its prior decision, *In the Matter of the Application of Roger Kaul for Exemption from Ad Valorem Taxation in Jackson County, Kansas*, Docket No. 91-6432-TX, original order dated September 2, 1992. Following the rationale of the earlier *Kaul* decision, BOTA decided that although the United States Supreme Court in *Yakima* and its progeny had removed *federal* restrictions on ad valorem taxation of unrestricted alienable land, such taxation was precluded by § 1 of the Act for Admission because the Act specifically excepted Indian lands from being a part of the state amenable to taxation. In reaching that determination, BOTA relied upon language in the Act for Admis-

sion and similar language in § 19 of the Organic Act: An Act to Organize the Territory of Kansas, enacted May 30, 1854.

BOTA observed that K.S.A. 79-101 provides that all property in the state shall be subject to taxation. BOTA noted that under the Act for Admission, "Indian lands" were not included within the territory of the State and concluded these lands were not subject to state taxation. BOTA further found that § 1 of the Act for Admission prohibited taxation of Kaul's land because the State of Kansas had not proceeded as required by federal law to obtain jurisdiction to tax land held by Indians, nor had the tribal Nation signified its assent to be within "the territorial limits or jurisdiction of the State of Kansas." BOTA did not elaborate as to the procedures Kansas should have followed to obtain jurisdiction to tax the land.

In reaching its conclusion, BOTA did not consider the source of Kaul's allotment or her fee patent. In addition, BOTA failed to address the relevance of the GAA, subsequent federal acts, and various treaties between the Potawatomi Tribe and the United States in connection with the tax-exempt status of the Kaul land.

The BOTA order included a strongly worded dissent by two board members. The dissent first opined that if Kaul contended her land was outside the boundaries of the State of Kansas, BOTA was without jurisdiction to consider the tax status of her land. The dissent then assumed it had jurisdiction, reviewed the United States Supreme Court decision in *Yakima*, and found that Kaul's land was freely alienable and subject to county taxing. The dissent did not address Kaul's argument related to the Act for Admission.

Subsequently, BOTA denied the County's petition for reconsideration. The County filed a petition in the district court for judicial review of the BOTA decision pursuant to the Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.* The district court reviewed the case on the merits and, agreeing with BOTA, held that the United States Supreme Court decision in *Yakima* was not controlling because the Act for Admission specifically exempted Indian lands from being a part of Kansas.

Without further discussion, the district court also concluded that (1) Article 2 of the Treaty with the Potawatomi of 1861 required that Kaul's parcel of land be exempt from levy, taxation, or sale; (2) Article 3 of the Treaty with the Potawatomi of 1867 prohibited the inclusion of the parcel within the jurisdiction of any state or territory; and (3) the State of Kansas never followed the procedures necessary to achieve the authority to tax the land, nor has the Potawatomi Tribe ever assented to taxation, both of which the district court found to be required by § 1 of the Act for Admission before Kansas could impose ad valorem taxes. The County appealed.

## Standard of Review

BOTA orders are normally subject to judicial review under the KJRA. See K.S.A. 74-2426(c); *In re Tax Appeal of A.M. Castle & Co.*, 245 Kan. 739, 741, 783 P.2d 1286 (1989). K.S.A. 77-623 provides that agency actions are reviewable by appellate courts as in other civil cases. K.S.A. 77-621(c) lists the criteria for district court review. Whether an agency has erroneously interpreted or applied the law in an unconstitutional manner is a question of law over which an appellate court has unlimited review. See K.S.A. 77-621(c)(1), (4); *Todd v. Kelly*, 251 Kan. 512, 515, 837 P.2d 381 (1992). The party challenging BOTA's action has the burden to prove that the action taken by BOTA was erroneous. See K.S.A. 77-621(a)(1).

Here we are not interpreting a statute, we are interpreting § 1 of the 1861 Act for the Admission of Kansas into the Union. In interpreting this Act, we apply the same rules that are applicable in interpreting the Kansas Constitution. In ascertaining the meaning of a constitutional provision, the primary duty of the courts is to look to the intention of the makers (the legislature) and the adopters (the voters) of that provision. *State ex rel. Stephan v. Finney*, 254 Kan. 632, 654, 867 P.2d 1034 (1994). A constitutional provision is not to be narrowly or technically construed, but its language should be interpreted to mean what the words imply to persons of common understanding. *Colorado Interstate Gas Co. v. Board of Morton County Commr's*, 247 Kan. 654, 660, 802 P.2d 584 (1990). Words in common usage are to be given their natural

and ordinary meaning in arriving at a proper construction. *Farmers Co-op v. Kansas Bd. of Tax Appeals*, 236 Kan. 632, 635, 694 P.2d 462 (1985).

There are well-established rules of statutory and constitutional construction applicable to tax matters: The power to levy taxes is inherent in the power to govern, but the exercise of that power is dependent upon the existence of legislation designating the kinds of property to be taxed. Nothing is taxable unless clearly within the grant of the power to tax. *Robbins-Leavenworth Floor Covering, Inc. v. Leavenworth Nat'l Bank & Trust Co.*, 229 Kan. 511, 512, 625 P.2d 494 (1981). The right to tax is penal in nature, and this right must be strictly construed in favor of the taxpayer. See *J.G. Masonry, Inc. v. Department of Revenue*, 235 Kan. 497, 500, 680 P.2d 291 (1984). Tax statutes will not be extended by implication beyond the clear import of the language employed therein, and their operation will not be enlarged so as to include matters not specifically embraced. *Director of Taxation v. Kansas Krude Oil Reclaiming Co.*, 236 Kan. 450, 455, 691 P.2d 1303 (1984). Where there is reasonable doubt as to the meaning of a taxing act, it will be construed most favorably to the taxpayer. *National Cooperative Refinery Ass'n v. Board of McPherson County Comm'rs*, 228 Kan. 595, 597, 618 P.2d 1176 (1980).

### Discussion

The County first argues that BOTA and the district court misinterpreted the relevant provisions of the 1854 Organic Act and 1861 Act for Admission. According to the County, these Acts did not exclude all Indian lands out of the boundaries of the state of Kansas, but rather *included* all Indian lands within the boundaries of the state unless these lands were specifically excluded by treaty. Second, the County contends that, even if the Acts can be construed to exclude Indian land from Kansas boundaries, as BOTA concluded, an 1861 treaty with the Potawatomi, as well as the GAA, provide that lands patented to Indians in fee are subject to taxation by the state. The County notes that, as in the *Yakima* decision, in Kansas, the burden of taxation runs with the land and cites K.S.A. 79-1804, which provides:

"A lien for all taxes shall attach to the real property subject to the same on the first day of November. . . , and such lien shall continue until such taxes and penalty . . . shall be paid . . . ."

The County also cites K.S.A. 79-101, which provides:

"All property in this state, real and personal, not expressly exempt therefrom, shall be subject to taxation in the manner prescribed by this act."

The County then concludes that because there are no state restrictions upon the County's authority to impose ad valorem taxes on fee-patented lands and the *Yakima* decision removed federal restrictions on allotted alienable and encumberable Indian land, Kaul's land is subject to state taxation.

First, we address the County's interpretation of the Organic Act and Act for Admission.

## I. The Kansas Acts

Section 19 of the 1854 Organic Act created the territorial government of Kansas and provided in part:

"That nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the Indians in said territory, so.long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with an Indian tribe, is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries, and constitute no part of the territory of Kansas, until said tribe shall signify their assent to the president of the United States to be included within the said territory of Kansas . . . ."

Section 1 of the 1861 Act for Admission contained similar language:

"That nothing contained in the said constitution respecting the boundary of said state shall be construed to impair the rights of person or property now pertaining to the Indians of said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with such Indian tribe, is not, without the consent of such tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries, and constitute no part of the state of Kansas, until said tribe shall signify their assent to the president of the United States to be included within said state . . . ."

BOTA and the district court rejected the County's assertion that the provision should be read to *include* all Indian land within the boundaries of Kansas as of January 29, 1861, unless excluded by a specific treaty. They construed these provisions to *exclude* all Indian lands from the boundaries of Kansas and therefore exempt these lands from state taxation unless an Indian or Indian tribe signified an assent to be included within the state by a specific treaty provision with the United States.

As authority for its argument that all Indian land is included within the boundaries of the state, the County cites *Blue-Jacket v. Commissioners of Johnson County*, 3 Kan. *299 (1865). *Blue-Jacket* came before this court only four years after the admission of Kansas into the Union and dealt with the taxation of patented lands owned by a member of the Shawnee Tribe. These lands were not freely alienable, as is Kaul's land; alienation of Blue-Jacket's land was restricted by federal law. The *Blue-Jacket* court noted that under the Kansas Constitution and laws, all the property not specifically exempted was subject to taxation; therefore, the lands of the united tribes of the Shawnee Indians were included unless controlled by exemption in a paramount law. 3 Kan. *299, Syl. ¶ 1.

After review of certain federal acts and treaties, the *Blue-Jacket* court concluded there was no express federal prohibition against the state taxation of the lands or the personal property of the Indians residing upon them. The court stated that in disposing of the lands to these Indians, the federal government, under its constitutional power, could make necessary rules respecting the territory and regulate commerce with the Indian tribes. 3 Kan. at *356. The court then found that the United States did not intend to prohibit state taxation of land held by the Shawnee Indians in severalty under patents from the government and in which they had the abstract of title to the land. 3 Kan. at *364.

This court's ultimate determination in *Blue-Jacket* that the Shawnee *restricted* lands were amenable to state taxation was reversed by the United States Supreme Court in *The Kansas Indians*, 72 U.S. (5 Wall.) 737, 18 L. Ed. 667 (1867). In reaching its conclusion, the Supreme Court reviewed whether the United States' treaties with the Shawnee Indians of 1831 and 1854 were enforce-

able to prevent Kansas from collecting property taxes from the Shawnee on their 200-acre allotments. It noted that the treaties with the Shawnee provided a guarantee that their lands should never be within the bounds of any state or territory. 72 U.S. at 753-54. The Supreme Court held that the Shawnee's tax immunity was guaranteed by the 1831 and 1854 treaties prior to the date of the enactment of the Act for Admission and "can only be changed by treaty stipulation, or a voluntary abandonment of their tribal organization." 72 U.S. (5 Wall.) at 757.

*Blue-Jacket* actually supports BOTA's position that pursuant to both the Kansas Organic Act and the Act for Admission, all Indian land was to be excluded from the boundaries of the state of Kansas unless specifically included by treaty. In further support of that determination is the statement of one leading commentator on state taxation of tribal lands, who described § 19 of the Act for Admission as "excluding from the boundaries and jurisdiction of Kansas any Indian lands that by terms of a treaty were not to be included within [the] state without the Indians' consent." Cohen, Handbook of Federal Indian Law, p. 263 (1982).

We conclude that interpreting the provisions of the Kansas acts as they are commonly understood does not support the County's position that all Indian land held in fee simple by an Indian is included within the state's boundaries and subject to an in rem ad valorem tax. The plain meaning appears more reasonably to state that all Indian land was to be excluded from the boundaries of the state and not subject to taxation, unless it was specifically included by treaty or an act of Congress.

We reach this conclusion by noting that the first clause of § 19 of the Organic Act provides that nothing in the Kansas Constitution relating to the boundaries of the state shall impair Indian personal or property rights unless those rights are extinguished by treaty with the United States government. The second clause states that nothing in the Constitution relating to the boundaries of the state shall include any territory which by existing treaty with a particular Indian tribe is not to be included in the territory of the state of Kansas without the tribe's consent. The third clause states that all territory referred to in the second clause is not to be included in

the territory of the state of Kansas until the Tribe signifies its assent to be included in the State of Kansas to the President of the United States. Section 19 does state, as BOTA and the district court determined, that it was necessary for Kansas to take affirmative steps to secure particular treaties with Indians or Indian tribes signifying their assent to be included within the boundaries of the state. Such assent was expected to be secured by treaty with the United States. We note that in *Parker v. Winsor*, 5 Kan. *362 (1870), it was observed regarding § 19 of the Organic Act and § 1 of the Act for Admission: "It would seem from these two acts that no rights that the Indians possessed before the state of Kansas was admitted into the Union, or before the territory of Kansas was organized, can be impaired." 5 Kan. at *367.

However BOTA and the district court construe § 1 and § 19 of the Kansas Acts, the parties agree that Indian lands can become part of Kansas and thus amenable to state taxation by treaty with the United States or by agreement with the state. This position is supported by *Board of Comm'rs v. U.S.*, 308 U.S. 343, 84 L. Ed. 313, 60 S. Ct. 285 (1939). This case involved taxes imposed by Jackson County, Kansas, upon land owned by a member of the Potawatomi Indian Tribe. The land was patented under the GAA in 1887 and held in trust until 1918. At that time, the Secretary of the Interior canceled the trust patent and issued a fee simple patent, over the objection of the Indian owner. Jackson County began to collect tax upon the property. In 1927, Congress authorized the Secretary to cancel fee patents issued over objection of the land's allottees. The fee patent to the land in question was canceled in 1935, and the Indian owner began proceedings to recover taxes collected by the county, with interest. The issue on appeal was not whether a refund of the tax was proper but rather whether the county should be liable for refund of interest.

In affirming the lower courts and holding that refund of interest was not proper, the Supreme Court commented:

"Jackson County in all innocence acted in reliance on a fee patent given under the hand of the President of the United States. Even after Congress in 1927 authorized the Secretary of the Interior to cancel such a patent, it was not until 1935 that such cancellation was made. Here is a long, unexcused delay in the

assertion of a right for which Jackson County should not be penalized. By virtue of the most authoritative semblance of legitimacy under national law, the land of [the Indian owner] and the lands of other Indians had become part of the economy of Jackson County. For eight years after Congress had directed attention to the problem, those specially entrusted with the intricacies of Indian law did not call Jackson County's action into question. Whatever may be her unfortunate duty to restore the taxes *which she had every practical justification for collecting at the time,* no claim of fairness calls upon her also to pay interest for the use of the money which she could not have known was not properly hers." (Emphasis added.) 308 U.S. at 352-53.

The implication of this language is that, under the right circumstances, state taxation of fee-patented Indian-owned land would be proper.

On appeal, Kaul contends treaties between the United States and the Potawatomi in 1846 and 1861 directly addressed the issue of inclusion of certain Indian land within the boundaries of the state of Kansas. BOTA did not address these treaties. The parties apparently raised these treaties for the first time before the district judge who made specific findings (without discussion) regarding each treaty. We turn now to a consideration of these two treaties.

## II. Treaties between the Potawatomi and the United States

The Treaty with the Potawatomi, June 5 and 17, 1846, 9 Stat. 853, provided that the United States would grant 576,000 acres of land in what would later become the State of Kansas to the Potawatomi Nation. The Treaty of 1846 found the various Potawatomi Tribes desirous of uniting to form one "common country"—the "Pottowautomie [*sic*] Nation." Article 4 of the Treaty of 1846 granted the tract of 576,000 acres, "being the eastern part of the lands ceded to the United States by the Kansas tribe or Indians . . . and [guaranteed] the full and complete possession of [the land so granted] to the Pottowautomie [*sic*] Nation, parties to this treaty, as their land and home forever." For this land, the tribes agreed to pay $87,000.

The Treaty with the Potawatomi, November 15, 1861, 12 Stat. 1191 diminished and partitioned the land granted to the Potawatomi in 1846. Article I declared the intention of the treaty was

"to dispose of a portion of their present reservation in Kansas . . . and to allot lands in severalty to those of said tribe who have adopted the customs of the whites and desire to have separate tracts assigned to them, and to assign a portion of said reserve to those of the tribe who prefer to hold their lands in common . . . ."

Article 2 directed the Indian agent to make a list of those tribal members wishing to hold lands in severalty and those desiring lands in common. Upon completion of the lists, parcels of the surveyed land were to be assigned to chiefs, head-men, heads of families, and others.

Article 2 discussed restrictions upon alienability of the land held by these tribal members in severalty:

"When such assignments shall have been completed, certificates shall be issued by the Commissioner of Indian Affairs for the tracts assigned in severalty, specifying the names of the individuals to whom they have been assigned, respectively, and that said tracts are set apart for the perpetual and exclusive use of such assignees and their heirs. Until otherwise provided by law, *such tracts shall be exempt from levy, taxation, or sale, and shall be alienable in fee or leased or otherwise disposed of only to the United States, or to persons then being members of the Pottawatomie [sic] tribe and of Indian blood, with the permission of the President, and under such regulations as the Secretary of the Interior shall provide, except as may be hereinafter provided.* (Emphasis added.)

The district court found that Article 2 "requires that the parcel at issue be exempt from levy, taxation or sale." Kaul makes the same argument before this court. Kaul relies upon the exclusionary language in Article 2 of the Treaty of 1861 quoted above as authority for her position that her land is exempt from taxation.

Both Kaul and the district court fail to address the fact that Article 2 of the Treaty of 1861 relates to *restricted and not freely alienable land,* nor do they address Article 3 of the treaty, which refers to fee simple parcels as taxable. We find Article 2 does not apply to tribal land patented in fee. It refers to assignment of parcels of tribal land upon which restrictions upon alienation remained. According to the language of this article, the owners of the parcels could only convey them to the United States or other members of their Tribe with permission of the President of the United States. Since the parcels were not freely alienable, they were exempt from taxation.

It is Article 3 of the Treaty of 1861 which addresses parcels patented in fee such as Kaul's and contains provisions providing exceptions to the exempt status of property granted in Article 2. The district court inexplicably (and without discussion) found that this Article did not apply to the Kaul's parcel.

Article 3 provides specifically:

> "At any time hereafter when the President of the United States shall have become satisfied that any adults, being males and heads of families, who may be allottees under the provisions of the foregoing article, are sufficiently intelligent and prudent to control their affairs and interests, he may, at the request of such persons, cause the lands severally held by them to be conveyed to them by patent in fee-simple, with power of alienation . . . . And on such patents being issued . . ., such competent persons shall cease to be members of said tribe, and shall become citizens of the United States; and *thereafter the lands so patented to them shall be subject to levy, taxation, and sale, in like manner with the property of other citizens.*" (Emphasis added.)

The provision states further that grant of the patent in fee simple was dependent upon the Indian owner appearing in a federal court and proceeding with a naturalization ceremony to demonstrate to the court that the owner was sufficiently intelligent to control and manage his affairs and was able to support a family for 5 years. Thereafter, the 1861 Treaty with the Potawatomi (which postdates the act to admit Kansas to the Union) specifically states in Article 3 that land allotted to individual tribe members in fee simple "shall be subject to levy, taxation, and sale, in like manner with the property of other citizens." Article 3 of the Treaty of 1861 contains provisions essentially similar to the GAA and grants the President of the United States the authority to issue fee patents to those Potawatomi Indians who were deemed competent to manage their own affairs. This provision could bring lands owned in fee by such Indians under state in rem jurisdiction for taxation if the appropriate conditions were met.

The district court also found that the 1867 Treaty with the Potawatomi, February 27, 1867, 15 Stat. 531, "requires that [Kaul's] parcel shall never be included within the jurisdiction of any State or Territory, except under certain conditions described in said treaty provision which are not applicable here." (BOTA made no

such finding.) The district court apparently based this conclusion upon language in Article 3 of that treaty, which provides: "After such reservation shall have been selected and set aside for the Pottawatomies, it shall never be included within the jurisdiction of any State or Territory." The district court failed to note that the Treaty of 1867 dealt not with lands within the state of Kansas but with lands south of Kansas in what is now Oklahoma. As the treaty states at the outset:

"Whereas the Pottawatomies believe that it is for the interest of their tribe that a home should be acquired for them in the Indian country *south of Kansas*, while there is yet an opportunity for the selection of a suitable reservation . . . . " (Emphasis added.)

### Article 1 of the 1867 treaty further provides:

"It being the intention of the Government that a commission shall visit the Indian country as soon as practicable after the ratification of the treaties *contemplating the removal of certain tribes from Kansas*, accompanied by delegates from the several tribes proposing to remove, it is agreed that a delegation of the Pottawatomies may accompany said commission in order to select, if possible, a suitable location for their people without interfering with the locations made for other Indians; and if such location shall be found satisfactory to the Pottawatomies, and approved by the Secretary of the Interior, such tract of land, not exceeding thirty miles square, shall be set apart as a reservation for the exclusive use and occupancy of that tribe."

### Article 3 of the Treaty of 1867 then provides:

"After such reservation shall have been selected and set apart for the Pottawatomies, it shall never be included within the jurisdiction of any State or Territory, unless an Indian Territory shall be organized . . . ."

With respect to Article 3 of the Treaty of 1867, Kaul states in a conclusory fashion that it applies to the Kansas and not the Oklahoma reservation, but offers no authority for this proposition. We disagree. A plain reading of Article 3 of the Treaty of 1867 reveals that it relates to land outside of the Kansas boundaries in Oklahoma. Therefore, the Treaty of 1867 applies to lands south of Kansas in Oklahoma, not to Potawatomi lands in Kansas, and not to Kaul's parcel.

## Conclusion

Kansas is precluded by § 1 of the Act for Admission from imposing ad valorem taxes on Kaul's fee-patented lands until the Act's exclusion is extinguished by an agreement between Kansas and the Potawatomi Indians or by treaty between the United States and such Indians.

Although Article 3 of the 1861 Treaty with the Potawatomi could result in the amenability to ad valorem taxation of certain parcels of freely alienable land, this does not end our inquiry. The County has not shown that this treaty was the source of Kaul's fee patent. Neither BOTA nor the district court made a finding of fact with respect to the source of Kaul's fee patent.

Under the Supreme Court's decision in *Yakima*, alienability of the land is not the sole test for the imposition of ad valorem taxes upon Kaul's property. First, Congressional intent to allow the imposition of ad valorem taxes upon the property must be found. Second, the taxing authority must examine the treaties and laws under which the tribal lands at issue were allotted to determine if the federal restrictions on alienation and taxation of tribal lands have been removed. Under the circumstances, it is impossible to analyze the applicability of *Yakima* to our issue without knowing the source of Kaul's fee patent and whether treaties or other laws have removed the restrictions on alienation and state taxation of tribal lands.

We reverse the district court. We remand the matter to BOTA first for additional findings with respect to the source of Kaul's fee patent and then for a determination of the propriety of state ad valorem taxation of Kaul's land in light of the treaties between the Potawatomi Tribe and the United States government and the Supreme Court decision in *Yakima*.