No. 82,273

IN THE MATTER OF THE APPLICATION OF NINA KAUL FOR
RELIEF FROM A TAX GRIEVANCE IN JACKSON COUNTY, KANSAS.

(4 P.3d 1170)

Opinion filed April 28, 2000.

*Michael C. Hayes,* of Oskaloosa, argued the cause, and was on the brief for appellant.

*John M. Cassidy,* assistant attorney general, argued the cause, and *Carla J. Stovall,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: In *In re Tax Exemption Application of Kaul,* 261 Kan. 755, 933 P.2d 717 (1997), hereafter referred to as *Kaul I,* this court considered § 1 of the 1861 Act for Admission of Kansas into the Union and the United States Supreme Court case of *County of Yakima v. Confederated Tribes and Bands of Yakima Nation,* 502 U.S. 251, 116 L. Ed. 2d 687, 112 S. Ct. 683 (1992), and concluded that if the source of Nina Kaul's fee patent was an act of Congress or an agreement or treaty excepting the land from ad valorem taxation, Kaul's property is not amenable to ad valorem taxation pursuant to § 1 of the Kansas Act for Admission. The case was remanded to the Board of Tax Appeals (BOTA) for findings regarding the source of Kaul's fee patent and for determination of the amenability of the property to state ad valorem taxation pursuant to the treaties between the Potawatomi Tribe and the United

States government, United States congressional acts, and the Supreme Court decision in *Yakima*.

On remand, the parties stipulated that on August 15, 1893, the parcel of land under consideration was allotted for 25 years in trust for the sole use and benefit of To-pen-i-be, or, at his demise, for the sole use of his heirs. Under the terms of the allotment, at the expiration of 25 years the United States would convey the parcel by patent to To-pen-i-be or his heirs in fee, discharged of the trust and free of all incumbrance. The allotment was executed by President Grover Cleveland pursuant to the Indian General Allotment Act of 1887 (GAA) (sometimes referred to as the Dawes Act), 24 Stat. 388-89, 25 U.S.C. 331 *et seq.* (1994). To-pen-i-be died in January 1894, survived by his 4-year-old son, We-zo. On May 9, 1911, the Second Assistant Commissioner of Indian Affairs transmitted documents to the Secretary of Interior regarding the sale of the parcel by the 21-year-old We-zo to James Cooney, a non-Indian. On May 22, 1911, the parcel was patented to James Cooney by fee patent executed by President William H. Taft. On June 13, 1911, a patent record was filed by the Jackson County Register of Deeds. At the present time, Nina Kaul is the fee simple title owner of the property.

Based on the stipulations of the parties, BOTA concluded that the congressional enactment under which Kaul's parcel was patented in fee clearly indicated that all federal restrictions on alienation and taxation had been removed from the land. Finding that Kaul's property is amenable to the taxing jurisdiction of Jackson County, BOTA denied the application of Kaul for relief from a tax grievance. Kaul's petition for reconsideration was denied by BOTA. Kaul again appealed the BOTA order to the Kansas Court of Appeals. Jackson County (County) moved that the Court of Appeals dismiss the case for lack of jurisdiction, citing K.S.A. 1998 Supp. 74-2426(c)(3). The Court of Appeals denied the motion, and the case was transferred to this court pursuant to K.S.A. 20-3018(c).

## JURISDICTION

The County again raises the jurisdictional issue, contending this court lacks jurisdiction because, pursuant to K.S.A. 74-2426(c), ju-

risdiction for appeal is in the district court. We note that the statute in effect at the time the original BOTA order was appealed in *Kaul I* did not state that the Court of Appeals had jurisdiction to review exemption orders. However, a 1998 amendment to 72-2426 was in effect at the time of BOTA's order on remand. K.S.A. 1999 Supp. 74-2426(c)(3) provides:

"(c) Any action of the board pursuant to this section is subject to review in accordance with the act for judicial review and civil enforcement of agency actions, except that:

. . . .

"(3) The court of appeals has jurisdiction of any action for review pertaining to property appraised and assessed by the director of property valuation, excise, income or inheritance taxes assessed by the director of taxation and *the exemption of any property from property taxation.* The district court of the proper county has jurisdiction in all other cases." (Emphasis added.)

Kansas recognizes a distinction between procedural and substantive changes in the law. *Resolution Trust Corp. v. Fleischer,* 257 Kan. 360, 368, 892 P.2d 497 (1995). Procedural laws are those that concern the manner and order of conducting suits or the mode of proceeding to enforce legal rights. Substantive laws establish the rights and duties of parties. If an amendment is to a procedural statute and does not prejudicially affect the substantive rights of parties, the general rule is that all actions will be subject to the new procedure whether they accrued before or after the change in the law and whether or not a suit had been instituted. *In re Tax Appeal of American Restaurant Operations,* 264 Kan. 518, 540, 957 P.2d 473 (1998).

K.S.A. 74-2426(c)(3) is a procedural statute describing the mechanism for carrying on the suit. Therefore, the 1998 amendment applies to the case, and the Court of Appeals has jurisdiction to review this case if the case falls within the categories provided in the statute, which include applications for tax exemptions.

This court favors substance over form. See *Green v. City of Wichita,* 26 Kan. App. 2d 53, 57, 977 P.2d 283, *rev. denied* 267 Kan. 888 (1999). Although BOTA converted Kaul's application for tax exemption to a tax grievance, Kaul filed an application for an exemption. The fact that the exemption statutes do not contain a

provision for exempting property owned by federally recognized members of Indian tribes located on federally recognized Indian reservations does not alter the substance of the application. Kaul's application was for a tax exemption, and, under K.S.A. 1999 Supp. 74-2426(c)(3), jurisdiction to review BOTA's order denying the exemption is in the appellate court.

Determination of whether Kaul's land is subject to state ad valorem taxation requires (1) an analysis of our 1854 Organic Act, the Kansas Act for Admission, and Kansas statutes to determine whether there exists a state law barring the imposition of ad valorem taxes on fee patented land, (2) the application of recent United States Supreme Court decisions to the facts, and (3) an analysis of federal law and a review of Kaul's chain of title to determine whether federal restrictions on alienation and taxation of her fee patented land have been removed.

## The Kansas Acts

Kaul argues that § 19 of the 1854 Organic Act, which created the territorial government of Kansas, and the Kansas Act for Admission, which were both discussed at length in the *Kaul I* opinion, forever excepted out of the boundaries of Kansas her parcel of land. The relevant sections of the Acts are set out to facilitate review of that argument.

Section 19 of the 1854 Organic Act provides, in part:

"That nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the Indians in said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with an Indian tribe, is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries, and constitute no part of the territory of Kansas, until said tribe shall signify their assent to the president of the United States to be included within the said territory of Kansas . . . ."

Section 1 of the 1861 Act for Admission contains similar language:

"That nothing contained in the said constitution respecting the boundary of said state shall be construed to impair the rights of person or property now pertaining to the Indians of said territory, so long as such rights shall remain unextinguished

by treaty between the United States or such Indians, or to include any territory which, by treaty with such Indian tribe, is not, without the consent of such tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries, and constitute no part of the state of Kansas, until said tribe shall signify their assent to the president of the United States to be included within said state . . . . "

In *Kaul I* we noted that under § 1 of the Kansas Act for Admission, no personal or property right that the Indians possessed before the Territory of Kansas was organized or the State of Kansas was admitted into the Union can be impaired unless such rights are extinguished by treaty between the United States and the Indians, or such Indians provide assent to the President of the United States that their lands be included within the boundaries of the State. We further note that Kansas is precluded by § 1 of the Kansas Act for Admission from imposing ad valorem taxes on fee-patented lands of the Citizen Band Potawatomi Tribe until the Act's exclusion is extinguished by an agreement between Kansas and the Indians or by treaty between the United States and such Indians. We found that alienability was not the only test for the imposition of Kansas ad valorem taxes upon Indian property. First, Congressional intent to allow the imposition of ad valorem taxes upon the property must be found. Second, a court must examine the treaties and laws under which the tribal lands at issue were allotted to determine if the federal restrictions on alienation and taxation have been removed. *Kaul I*, 261 Kan 755, Syl. ¶¶ 7, 8, 9.

In *Kansas Indians*, 72 U.S. (5 Wall.) 737, 18 L. Ed. 667 (1867), the United States Supreme Court reviewed the treaties with the Shawnee Indians of 1831 and 1854 to determine whether the treaties were enforceable to prevent Kansas from collecting property taxes from the Shawnee on their 200-acre restricted allotments. The treaties with the Shawnee guaranteed that their lands should never be within the bounds of any state or territory. The Supreme Court held that the Shawnee's tax immunity was guaranteed by treaty prior to the date of the enactment of the Kansas Act for Admission but could be changed by treaty stipulation or by a voluntary abandonment of their tribal organization. 72 U.S. (5 Wall.) at 757.

It is necessary, therefore, to examine the treaties between the United States and the Potawatomi to determine if a provision exists that excludes the Potawatomi lands held in fee simple by individual members of the tribe from inclusion within the boundaries of Kansas.

## Treaties Between the Potawatomi and the United States

In *Kaul I* this court found that the United States Treaty with the Potawatomi, November 15, 1861, 12 Stat. 1191, provided in Article 2 an exemption from levy, taxation, or sale to tracts of Potawatomi land which are encumbered with restrictions on alienability. 261 Kan. at 772. *Kaul I* also found that Article 3 of the treaty addresses parcels patented in fee. The provision stated that grant of a patent in fee simple was dependent upon the Indian owners appearing in a federal court and proceeding with a naturalization ceremony to demonstrate to the court that they were sufficiently intelligent to control and manage their affairs and had been able to support their families for 5 years. Thereafter, the treaty, which postdates the Kansas Act for Admission, specifically states that land allotted to individual tribe members in fee simple is subject to levy, taxation, and sale in like manner with the property of other citizens. 261 Kan. at 773. The provisions of Article 3 are similar to the 1887 GAA and grant the President of the United States the authority to issue fee patents to those Potawatomi Indians who were deemed competent to manage their own affairs.

The United States Treaty of 1861 diminished and partitioned the land granted to the Potawatomi in 1846. As found in *Kaul I*, Article 2 of the Treaty of 1861 excludes restricted Indian lands from state taxation. 261 Kan. at 772.

The United States Treaties with the Potawatomie, June 5 and 17, 1846, 9 Stat. 853, and 1861 which granted lands to the Potawatomi Tribe in Kansas do not contain language excluding lands owned in fee simple by individual tribe members from the boundary of the state and do not except unrestricted parcels from taxation. Therefore, the Kansas Act for Admission does not preclude the state from forever imposing ad valorem taxes upon Kaul's property, a parcel patented in fee simple.

United States Supreme Court Decision on
Ad Valorem Taxation on Indian Lands

*Board of Comm'rs v. United States*, 308 U.S. 343, 84 L. Ed. 313, 60 S. Ct. 285 (1939), involved taxes imposed by Jackson County, Kansas, upon land owned by a member of the Potawatomi Indian tribe. The land was patented under the GAA in 1887 and held in trust until 1918. At that time, the Secretary of the Interior canceled the trust patent and issued a fee simple patent, *over the objection of the Indian owner*. Jackson County began to collect tax upon the property. In 1927, Congress authorized the Secretary to cancel fee patents issued over objection of allottees. After the fee patent to that land was canceled in 1935, the Indian owner commenced proceedings to recover taxes collected by the county plus interest. The issue appealed was not whether a refund of the tax was due but rather whether the County was liable for refund of interest. In affirming the lower courts and holding that refund of interest was not due, the United States Supreme Court stated:

"Jackson County in all innocence acted in reliance on a fee patent given under the hand of the President of the United States. Even after Congress in 1927 authorized the Secretary of the Interior to cancel such a patent, it was not until 1935 that such cancellation was made. Here is a long, unexcused delay in the assertion of a right for which Jackson County should not be penalized. By virtue of the most authoritative semblance of legitimacy under national law, the land of [the Indian owner] and the lands of other Indians had become part of the economy of Jackson County. For eight years after Congress had directed attention to the problem, those specially entrusted with the intricacies of Indian law did not call Jackson County's action into question. Whatever may be her unfortunate duty to restore the taxes *which she had every practical justification for collecting at the time*, no claim of fairness calls upon her also to pay interest for the use of the money which she could not have known was not properly hers." (Emphasis added.) 308 U.S. at 352-53.

The United States Supreme Court's statement implies that taxation of fee-patented Indian-owned land was proper until the Indian owner objected to the issuance of the fee simple patent and Congress authorized the Secretary to cancel the fee patents issued.

*Kaul I* relied on *County of Yakima v. Confederated Tribes and Bands of Yakima Nation*, 502 U.S. 251, 116 L. Ed. 2d 687, 112 S. Ct. 683 (1992), in determining that alienability of the land is not

the sole test for the imposition of ad valorem taxes on property held by members of Indian tribes.

"First, Congressional intent to allow the imposition of ad valorem taxes upon the property must be found. Second, the taxing authority must examine the treaties and laws under which the tribal lands at issue were allotted to determine if the federal restrictions on alienation and taxation of tribal lands have been removed." 261 Kan. at 775.

Six years after *Yakima*, the Supreme Court decided *Cass County v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 141 L. Ed. 2d 90, 118 S. Ct. 1904 (1998). In *Leech Lake*, Cass County had assessed ad valorem taxes on 21 parcels of reservation land that had been alienated under the Nelson Act and subsequently reacquired by the Leech Lake Band (the Band). Cass County assessed the taxes based on the Supreme Court's decision in *Yakima* that a "county could assess ad valorem taxes on reservation land owned in fee by individual Indians or the tribe and originally made alienable when patented in fee simple under the GAA." 524 U.S. at 109. The Band then filed suit in the federal district court, seeking a declaratory judgment that the county could not tax the parcels. The district court granted summary judgment to Cass County, holding that all of the land that had been alienated under the Nelson Act was taxable. The Eighth Circuit affirmed the taxation only as to the parcels allotted to individual Indians, since these lands were allotted under the proviso in the Burke Act whose explicit mention of taxation manifested the necessary unmistakably clear intent, and reversed as to the taxation of the parcels sold to non-Indians under sections 5 and 6 of the GAA.

The Court in *Leech Lake* noted that in *Yakima*, it had found that both the Burke Act proviso and section 5 of the GAA manifested an unmistakably clear intent to allow state and local taxation of allotted land. 524 U.S. at 112. Justice Thomas, writing for a unanimous court, held that state and local governments may impose ad valorem taxes on reservation land that was made alienable by the Nelson Act, sold to an Indian or a non-Indian, and subsequently repurchased by an Indian tribe. 524 U.S. at 114.

In its analysis, the United States Supreme Court reviewed the source of the Indians' patent. The Court found that under the GAA

of 1887, implemented for the Band through the Nelson Act of 1889, the Leech Lake reservation land was allotted to individual Indians and to non-Indians. In 1977, in response to the Band's ownership of less than 5 percent of the reservation land, the Band sought to re-establish its land base by repurchasing parcels of reservation land which had been allotted to individual Indians or sold to non-Indians.

The United States Supreme Court found that in the case of the Leech Lake Reservation, Congress removed that land from federal protection and made it fully alienable when it provided for the public sale of reservation land to non-Indians in the Nelson Act. 524 U.S. at 113. The Court held that under the principles established in *Yakima*, the land is taxable. To hold otherwise, the Court stated, would attribute to Congress the odd intent of taxing parcels conveyed to Indians, and not taxing those conveyed to non-Indians. 524 U.S. at 113.

The United States Supreme Court rejected the Band's contention that the land reassumed tax-exempt status when the Band reacquired the lands in fee. The Court explained that the subsequent repurchase of reservation land by a tribe does not manifest Congress' intent to reassume federal protection of that land and to oust state taxing authority, especially when Congress had explicitly relinquished such protection many years before. 524 U.S. at 114.

The United States Supreme Court stated that state and local governments may not tax Indian reservation land unless Congress ceases its jurisdiction over the land. Jurisdiction ceases only when Congress makes its intent to authorize state and local taxation of Indian reservation land "unmistakably clear." 524 U.S. at 112. Congress manifests the intent to authorize state and local taxation of Indian reservation land when it authorizes reservation lands to be allotted in fee to individual Indians, which makes the lands freely alienable and withdraws them from federal protection. 524 U.S. at 114.

## Federal Acts Applicable to Kaul's Chain of Title

Kaul's chain of title dates back to 1893 when To-pen-i-be, a Potawatomi Indian, was issued an allotment pursuant to the GAA.

25 U.S.C. § 331 *et seq.* (1994). To-pen-i-be's allotment was subject to the restrictions of § 5 of the GAA. Section 5 of the GAA provided that parcels of tribal land would be patented to individual Indians and held in trust by the United States for a 25-year period, after which the federal government would convey title to the individual allottees in fee, discharged of the trust and free of all charge or incumbrance. At To-pen-i-be's death in 1894, 24 years prior to the expiration of the 25-year trust period, To-pen-i-be's son, We-zo acquired the allotment as heir.

We-zo's conveyance of the land to James Cooney, a non-Indian, resulted in the issuance of a fee simple patent to Cooney filed in Jackson County on June 13, 1911. The letter written by the Second Assistant Commissioner recommending to the Secretary of Interior that the sale to Cooney be approved included the following note:

"The sale of the land described herein is approved pursuant to the provisions of the act of Congress of May 27, 1902 (32 Stat. L., 245-275), and the act of Congress of May 29, 1908 (35 Stat. L., 444), as modified by the act of June 25, 1910 (36 Stat. L., 555-556), and the regulations of the Department promulgated October 12, 1910."

The reference to "36 Stat. L., 555-556" is a typographical error, referring to a 1910 amendment to an act to regulate commerce, and concerns matters unrelated to Indian affairs. Clearly, the statute intended to be referenced in the previously quoted paragraph is 36 Stat. 855-56, which amended 35 Stat. 444.

Relative to the disposition of allotted lands where the allottee dies prior to the expiration of the trust period, Congress in 1902 enacted 32 Stat. 275, 25 U.S.C. 379 (1994). Section 7 of that enactment provides:

"That the adult heirs of any deceased Indian to whom a trust or other patent containing restrictions upon alienation has been or shall be issued for lands allotted to him may sell and convey the lands inherited from such decedent . . . but all such conveyances shall be subject to the approval of the Secretary of Interior, and when so approved shall convey a full title to the purchaser, the same as if a final patent without restriction upon the alienation had been issued to the allottee. All allotted land so alienated by the heirs of an Indian allottee and all land so patented to a white allottee shall thereupon be subject to taxation under the laws of the State or Territory where the same is situated . . . ."

In 1906, Congress further amended the GAA by the Burke Act, 34 Stat. 182, 25 U.S.C. § 349 (1994). The Burke Act, entitled "Patents in fee to allottees," contains a proviso that the Secretary of Interior can, if "satisfied that any Indian allottee is competent and capable of managing his or her affairs," authorize issuance of a fee simple patent to the land before the end of the usual trust period, "and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed . . . ."

In 1908, 35 Stat. 444 was enacted and provided that any parcel allotted to any Indian, or any inherited interest in land which could be sold under existing law by the authority of the Secretary of the Interior may be sold on the petition of the allottee or his heirs on the terms and conditions the Secretary of the Interior may prescribe. The statute further provided:

"When any Indian who has heretofore received or who may hereafter receive, an allotment of land dies before the expiration of the trust period, the Secretary of the Interior shall ascertain the legal heirs of such Indian, and if satisfied of their ability to manage their own affairs shall cause to be issued in their names a patent in fee simple for said lands; but if he finds them incapable of managing their own affairs, the land may be sold as herein before provided . . . ." 25 U.S.C. § 404 (1994).

The final statute applicable to this case is a 1910 enactment, 36 Stat. 855-56, which amended the 1908 Act. That statute provided, in part:

"When any Indian to whom an allotment of land has been made, or may hereafter be made, dies before the expiration of the trust period and before the issuance of a fee simple patent, without having made a will disposing of said allotment as hereinafter provided, the Secretary of the Interior, upon notice and hearing, under such rules as he may prescribe, shall ascertain the legal heirs of such decedent, and his decision thereon shall be final and conclusive. If the Secretary of the Interior decides the heir or heirs of such decedent competent to manage their own affairs, he shall issue to such heir or heirs a patent in fee for the allotment of such decedent; if he shall decide one or more of the heirs to be incompetent he may, in his discretion, cause such lands to be sold . . . ." 25 U.S.C. § 372 (1994).

Kaul contends that We-zo did not convey a fee simple interest to Cooney because there is no evidence that We-zo had obtained a fee simple interest prior to the conveyance. As Kaul points out,

the record does not indicate that We-zo was determined competent to manage his affairs, as required by 35 Stat. 444 and 36 Stat. 855-56. Kaul acknowledges that the statutes referenced in the approval letter refer to 32 Stat. 245-75, which provides that an adult heir of an allottee may convey full title to a purchaser, the same as if a final patent without restriction upon the alienation had been issued to the allottee and that all allotted land so alienated and so patented to a white allottee is subject to taxation under the laws of the State where the land was situated.

Clearly, the applicable federal statutes and the documents of record establish that in 1911, Kaul's land was titled in fee simple when it was conveyed to Cooney. Moreover, Kaul stipulates that she owns the property in fee simple. At this time, Kansas has no impediment to the taxation of that land. Freely alienable land within the state is subject to ad valorem taxation. Therefore, BOTA was correct in finding that the congressional enactment under which Kaul's parcel was patented in fee removed all federal restrictions on alienation and taxation.

Affirmed.