No. 94,781

WINNEBAGO TRIBE OF NEBRASKA, *et al. Plaintiffs*, v. PHILL KLINE, ATTORNEY GENERAL, FOR THE STATE OF KANSAS, *et al., Defendants.*

(150 P.3d 892)

Opinion filed February 2, 2007.

*Skip C. Durocher*, of Dorsey & Whitney LLP, of Minneapolis, Minnesota, argued the cause, and *Mary J. Streitz* and *Christopher R. Duggan*, of the same firm; *Thomas E. Wright*, of Wright, Henson, Clark, Hutton, Mudrick & Gragson, LLP, of Topeka; *Danelle Smith*, of Winnebago Tribe of Nebraska, of Winnebago, Nebraska; *Mark S. Gunnison*, of Payne & Jones, Chartered, of Overland Park; *Thomas Weathers*, of Alexander, Berkey, Williams & Weathers, LLP, of Berkeley, California; and *Ilse Smith*, of Horton, were with him on the brief for plaintiffs.

*John Michael Hale*, of Kansas Department of Revenue, argued the cause, and *Jay D. Befort, J. Brian Cox*, and *Brian R. Johnson*, all of the Kansas Department of Revenue, were with him on the briefs for defendants.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The plaintiffs are Indian Tribes that filed an action in the United States District Court seeking an order enjoining Kansas officials' enforcement of the motor-fuel tax law, K.S.A. 79-3401 *et seq.* (Act), and a determination that the Act does not authorize assessment of tax on motor fuel delivered and sold by a Nebraska tribal corporation to tribes in Kansas for on-reservation retail sale. Injunctive relief was granted by the federal district court, see *Winnebago Tribe of Nebraska v. Stovall*, 205 F. Supp. 2d 1217 (D. Kan. 2002), and *Winnebago Tribe of Nebraska v. Sto-*

*vall*, 216 F. Supp. 2d 1226 (D. Kan. 2002), and affirmed by the Tenth Circuit Court of Appeals, 341 F.3d 1202 (10th Cir. 2003). Federal District Judge Thomas Marten certified the following question of law to this court pursuant to K.S.A. 60-3201:

"DOES THE KANSAS MOTOR-FUEL TAX, K.S.A. 79-3401 *ET SEQ.*, IM-POSE FUEL TAX COLLECTION OR PAYMENT RESPONSIBILITY UPON NON-RESIDENT INDIAN TRIBES WHO IMPORT FUEL FROM OUT-SIDE KANSAS AND DELIVER THE FUEL TO OUTLETS IN INDIAN RES-ERVATIONS WITHIN THE STATE OF KANSAS?"

## FACTS:

The federal district court's order certifying the question to this court was precipitated by the Indian Tribes' motion for summary judgment. In its order, the federal district court made findings of fact and set out the parties' arguments before concluding that cer-tification was appropriate in the absence of controlling precedent on an issue that may be determinative of the case. With the ref-erences to the district court record omitted, the following state-ment of facts is quoted from the federal district court's order:

"Plaintiff Winnebago Tribe of Nebraska is a federally-recognized American In-dian Tribe organized under the Indian Reorganization Act of 1934, 25 U.S.C. § 476, and is the beneficial owner of and exercises jurisdiction over the Winnebago Tribe of Nebraska Indian Reservation. The Winnebago reservation is located in northeast Nebraska, and is not contiguous to Kansas. Ho-Chunk, Inc., and plaintiff HCI Distribution are corporations organized under the laws of the Winnebago Tribe. HCI is wholly-owned by Ho-Chunk Inc., which in turn is wholly-owned by the Winnebago Tribe.

"*The Winnebago Indian News*, dated January 18, 2005, indicates that Ho-Chunk, Inc., the parent company of HCI Distribution, had 2003 non-gaming revenues of $80 million and was 'featured in Inc. magazine as one of the 500 fastest growing companies in the United States.'

"According to the website maintained by the plaintiff Winnebago Tribe, Ho-Chunk, Inc., is apparently a holding company with the following 'business list': HCI Distribution (tobacco and gasoline products); Heritage Express (convenience stores specializing in discount gas and cigarette sales); AllNative.com (Native American e-commerce site); Blue Earth Marketing (marketing, advertising and graphic design); AllNative Office (office products, machines, furniture); In-dianz.com (Native American Indian news); AllNative Systems (communications solutions); Dynamic Homes (modular housing manufacturer); HCI Construction (solutions for individual and commercial building); Ho-Chunk Community De-velopment (501(c)3 nonprofit corporation); REZ Cars (used car dealership). The

2001 Annual Report for Ho-Chunk Inc. states that 'Ho-Chunk, Inc. was established so that tribal business operations would be free from political influence and outside the bureaucratic process of the government.'

"On May 8, 2001, HCI mailed to the Kansas Department of Revenue both an Application for Motor Vehicle Fuel and Special Fuel Importer/Exporter License and an Application for Motor Vehicle Fuel and Special Fuel Distributor's License. Along with these applications, HCI mailed a Motor Vehicle Fuel and Special Fuel Importer/Exporter Bond in the amount of $5,000.00 and a Motor Vehicle Fuel and Special Fuel Distributor's Bond in the amount of $1,000.00.

"On May 11, 2001, the Department returned the Application for Motor Vehicle Fuel and Special Fuel Distributor's License and the Motor Vehicle Fuel and Special Fuel Distributor's Bond to HCI by mail.

"According to HCI employee Crystal Appleton, when she received the returned application and bond, she called the Department to ask why the documents were returned. The Department representative told her that the Department did not require that HCI obtain a distributor's license, and that the only license that HCI needed was an importer/exporter license. According to the defendant, HCI would not qualify for a distributor's license because they indicated they did not have a place of business in the State of Kansas.

"The Department issued to HCI a Motor Fuel Importer/Exporter License with an effective date of May 4, 2001, instead of a distributor's license.

"Plaintiff Sac and Fox Nation of Missouri is a federally-recognized American Indian Tribe.

"The Sac and Fox Nation wholly owns and operates two retail gas stations—the Trad'n Post in Reserve, Kansas, and the Sac & Fox Truck Stop in Powhattan, Kansas. Both of these tribally-owned businesses are located on land held in trust by the United States for the benefit of the Sac and Fox Nation.

"Plaintiff the Iowa Tribe of Kansas and Nebraska is a federally-recognized American Indian Tribe. The Iowa Tribe wholly owns and operates a gas station in Kansas on land held in trust for the Iowa Tribe by the United States of America.

"Plaintiff the Kickapoo Tribe of Indians of the Kickapoo Reservation is a federally-recognized American Indian Tribe. The facts are disputed as to the location of the Tribe's gas stations. According to plaintiffs, the Kickapoo Tribe owns and operates two gas stations in Kansas located on lands within the exterior boundaries of the reservation pursuant to Treaties executed in 1854. According to defendants, the only gas station of the Kickapoo mentioned in the complaint is a 'Truck Plaza' which sits outside the boundaries of the Kickapoo Tribe's reservation.

"HCI began selling fuel to the Kansas Tribes in August 2001. The Winnebago Tribe has transported the fuel sold to the Kansas Tribes by tanker trucks from Nebraska to the Kansas Tribes' tribal gas stations.

"At no time did the Winnebago Tribe ever purchase or receive the subject fuel in Kansas from any person, and the fuel was not stored and did not come to rest in Kansas before its delivery by the Winnebago Tribe to the Kansas Tribes' facil-

ities. The Winnebago Tribe did not and does not own or lease storage facilities, transfer facilities, mixing facilities, offices or any other facilities within Kansas.

"On September 10, 2001, shortly after the Winnebago Tribe started selling motor fuel to the Kansas Tribes, defendant Lochow of the Kansas Department of Revenue sent a letter to the Winnebago Tribe. Lochow stated that HCI, as a licensed importer under the Act, was required to report and remit Kansas fuel taxes on deliveries of fuel to any retailer in Kansas regardless of location.

"John Blackhawk, Chairman of the Winnebago Tribe, responded to Lochow's letter on September 18, 2001, writing that the Winnebago Tribe disputed that Kansas had the right under federal law to tax the sales to the Kansas Tribes.

"On October 17, 2001, Charles Reomer of the Kansas Department of Revenue responded to Blackhawk's letter by once again demanding payment of the fuel tax, and stating that '[u]nder Kansas law, tax is due upon importation of motor fuel by the distributor of first import.'

"On April 8, 2002, defendant Scott, designee of the Director of Taxation, Kansas Department of Revenue, submitted an Affidavit and Application for Arrest Warrant that led to the seizures of property and other actions that necessitated this lawsuit. The affidavit and application stated that 'the distributor, importer or manufacturer on or before the 25th day of each month, shall render to the director at the director's office in Topeka, Kansas a report "certified to be true and correct showing the number of gallons of motor fuel imported." See K.S.A. 79-3410.' In fact, Section 79-3410 of the Act states that the report must show 'the number of gallons of motor-vehicle fuels or special fuels received by such distributor, manufacturer, importer, exporter or retailer during the preceding calendar month'.

"On the following day, April 9, 2002, the defendants seized the following property of HCI: two trucks, two tanker trailers, fuel and fuel oil, two black permit books and shipping papers. The parties dispute whether the seizures occurred with prior notice. On the same date, the Department of Revenue entered orders for jeopardy assessment and issued tax warrants against HCI and the individual plaintiffs. The plaintiffs also allege that the defendants also initiated criminal proceedings against plaintiffs HCI, Chairman Blackhawk and Lance Morgan, but the evidence fails to support the contention, and defendants deny it. The record shows only that criminal proceedings were commenced by the State of Kansas.

"According to the defendants, HCI transports the fuel in its own trucks, and the contracts entered into between the Kansas Tribes and HCI appear to be 'destination contracts,' under which title would not pass until HCI tendered the fuel in Kansas.

"Plaintiffs Sac and Fox Nation and Iowa Tribe do not know where the contracts with HCI were entered into. The Kansas Department of Revenue has ruled that the state fuel tax in issue is imposed on a distributor when such fuel is first received in the State of Kansas at its business.

"In February, 2002, the Department of Revenue introduced a new fuel tax bill that proposed to replace the 'distributor of the first receipt' language with a phrase stating that 'the incidence of the tax is imposed when the fuel is received.' This

same Senate bill proposed to amend the definition of 'received' to include language that the fuel is received 'in the case of imports, other than by pipeline, upon entry into this state' thereby defining 'received' for the first time to encompass nonresident importers. SB 537 was never enacted into law.

"The Internet sites of the Sac and Fox and the Kickapoo Tribes solicit customers to travel to their casinos via state highways.

"HCI uses Kansas highways in making its deliveries. HCI imports fuel into Kansas in making deliveries to the Kansas tribes. HCI must cross the Kansas State line to reach the Kansas Tribes' properties in Kansas, located in Brown County, Kansas. The distance from Emerson, Nebraska, referred to in the plaintiffs' complaint as the site of HCI's blending facility, to Reserve, Kansas (near the Sac and Fox reservation), is approximately 170 miles. The distance from Emerson, Nebraska, to White Cloud, Kansas (near the Iowa reservation) is approximately 176 miles. The Kickapoo reservation is further south, in the southwest part of Brown County.

"KDR's bond application form for importers/exporters has provided for some years:

WHEREAS, The above-named principal is an importer/exporter within the provisions of the motor fuel tax laws of the state of Kansas, and is required by such law to render certain sworn statements and reports and pay certain motor fuel taxes, interest and penalties, all to the Director of Taxation, Kansas Department of Revenue, Topeka, Kansas, and to otherwise comply with the provisions of said laws[.]

"KDR's 'distributors' tax return, form MF-52, used by both distributors and importers, requires reporting of, and taxes, motor fuel 'received or imported,' and has for years.

"Plaintiff HCI submitted to KDR on or about May 14, 2001, a 'Motor Vehicle Fuel and Special Fuel Importer/Exporter Bond' which contained language identical to that in KDR's bond application form. HCI also filed distributor's tax returns with KDR for the months May, June, July, August, September, October, November, December 2001; January, February, 2002, reporting '0' gallons of fuel 'received or imported.' HCI's tax returns filed with KDR for September, October, November, December, 2001, and January, February 2002 'falsified the number of gallons of motor fuel actually delivered into Kansas associated with the delivery of motor fuels to the Kickapoo, Iowa Tribe and Sac Fox.' HCI ceased filing distributor's tax returns with KDR in March 2002.

"HCI's 'Application for Motor Vehicle Fuel and Special Fuel Importer/Exporter License' was signed by Lance Morgan, and indicated that statements contained therein were true and correct and that HCI consented to certain service of process provisions. In their answer to defendants' request for admission no. 4, the plaintiffs Winnebago/HCI indicated that 'Lance Morgan had no actual authority to waive HCI's sovereign immunity and that in the absence of such authority no valid waiver of HCI's sovereign immunity was ever effected under the

rules for effecting such waivers that are set forth in HCI's Articles of Incorporation.'

"Former Secretary of Revenue Stephen Richards provided testimony to the 2002 Senate Taxation Committee regarding Senate Bill 537 concerning why moving the motor fuel tax to the rack was good tax policy. Former Secretary of Revenue Stephen Richards also provided at that time a diagram indicating the state of the KMFTA as concerned importers and distributors, and indicating that the tax is due on the first import. Shirley Sicilian, for Director, Policy and Research, KDR, gave testimony to the 1998 Kansas legislature regarding Senate Bill 421 that the intent of the bill was to make clear that the tax was on the distributor not the retailer.

"In May 1994, the Kansas legislative Division of Post-Audit ('LPA') conducted a performance audit of KDR's enforcement of the KMFTA and discussed the state of the KMFTA, including that importers pay the motor fuel tax.

"According to the evidence supplied by defendants, Importers, as distinguished from distributors, have paid Kansas motor fuel tax on motor fuel imported into Kansas for at least the past 23 years, and KDR is unaware of any information that they did not pay the tax for the 49 years prior to that. Plaintiffs have cited one instance of another importer who has left payment of the tax to its retailer."

## DISCUSSION

Statutory basis for tax liability. The Kansas motor-fuel tax law, K.S.A. 79-3401 *et seq.*, imposes a tax that is used for the construction and maintenance of public highways. K.S.A. 79-3402. "A tax per gallon . . . is hereby imposed on the use, sale or delivery of all motor vehicle fuels or special fuels which are used, sold or delivered in this state for any purpose whatsoever." K.S.A. 2005 Supp. 79-3408(a). "Unless otherwise specified in K.S.A. 79-3408c, and amendments thereto, the incidence of this tax is imposed on the distributor of the first receipt of the motor fuel and such taxes shall be paid but once. Such tax shall be computed on all motor-vehicle fuels or special fuels received by each distributor, manufacturer or importer in this state and paid in the manner provided for herein . . . ." K.S.A. 2005 Supp. 79-3408(b).

According to KDR, HCI is an importer of motor fuel from Nebraska into Kansas for the purpose of selling or delivering it. KDR's asserted basis for HCI's tax liability is that "[w]hen HCI's trucks cross the Kansas state line with a delivery destination to the Kansas tribes in Kansas, such is a taxable event, and tax is imposed in a nondiscriminatory manner on every importer, Indian or other-

wise." (KDR cites *Sac and Fox Nation of Missouri v. Pierce*, 213 F.3d 566, 582 [10th Cir. 2000], *cert. denied* 531 U.S. 1144 [2001], for the proposition that the tax is nondiscriminatory, which is not at issue here.)

HCI's position is that it is not liable for payment of the tax under the express terms of the Act because it does not receive fuel within Kansas and it is not a distributor.

KDR contends that importers as well as distributors bear the incidence of the Kansas motor fuel tax. With regard to HCI's receiving fuel, KDR states that it "has interpreted the terms 'received' and 'receipt,' as applied to importers, to mean when the importer delivers fuel into Kansas" because an importer with no place of business in this state "cannot 'receive' fuel in Kansas in any fashion *other* than to import it by bringing it across the Kansas state line for purposes of use, sale, or delivery in Kansas." Seemingly conceding that its interpretation is not to be found in the express language of the statute, KDR urges the court to apply the rule of statutory construction called operative construction.

The doctrine of operative construction of statutes provides that the interpretation of a statute by an administrative agency charged with the responsibility of enforcing the statute is entitled to judicial deference. If there is a rational basis for the agency's interpretation, it should be upheld on judicial review. If, however, the reviewing court finds that the administrative agency's interpretation is erroneous as a matter of law, the court should take corrective steps. The determination of an administrative agency as to questions of law is not conclusive and, while persuasive, is not binding on the courts. *GT, Kansas, L.L.C. v. Riley County Register of Deeds*, 271 Kan. 311, 317, 22 P.3d 600 (2001).

In this regard, the United States Supreme Court has stated that to sustain an agency's application of a statute, " 'we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' " *Udall v. Tallman*, 380 U.S. 1, 16, 13 L. Ed. 2d 616, 85 S. Ct. 792 (1965) (quoting *Unemployment Comm'n v. Aragon*, 329 U.S. 143, 153, 91 L. Ed. 136, 67 S. Ct. 245 [1946]).

The taxable event. KDR's position is that the taxable event is HCI's tank trucks crossing the state line from Nebraska into Kansas. In other words, HCI's trucks crossing the state line constitutes HCI's receipt of the fuel in Kansas for purposes of the Act. KDR interprets the terms "received" and "receipt," as applied to a person with no place of business in this state, to mean when the person crosses the state line to deliver fuel within the state of Kansas.

There is a definition of "received" in the Act, K.S.A. 79-3401(p). HCI quotes the statutory definition for the proposition that 79-3401(p) excludes persons who import motor fuel into the state of Kansas by truck. K.S.A. 79-3401(p) states:

" '[R]eceived' means motor-vehicle fuel or special fuel produced, refined, prepared, distilled, manufactured, blended or compounded at any refinery or other place, in the state of Kansas by any person, or imported into this state from any other state, territory, or foreign country by pipeline or connecting pipeline at a pipeline terminal or pipeline tank farm for storage, shall be deemed to be 'received' by such person thereat when the same shall have been loaded at such refinery, pipeline terminal, pipeline tank farm or other place, into tank cars, tank trucks or other container, or placed in any tank from which any withdrawals are made direct into tank cars, tank trucks or other types of transportation equipment, containers or facilities."

This expansive definition anticipates a number of different ways in which motor fuel is treated and transported.

First is motor-vehicle fuel or special fuel that is refined, prepared, distilled, manufactured, blended, or compounded at any refinery or other place in the state of Kansas by any person. The first category does not apply to the motor fuel at issue in this case, which is blended in Nebraska by HCI before being transported into Kansas.

Second is motor-vehicle fuel or special fuel imported into this state from any other state, territory, or foreign country by pipeline or connecting pipeline at a pipeline terminal or pipeline tank farm for storage. This part of the definition is read by HCI to apply only to fuel imported into Kansas by pipeline. KDR does not contend that 79-3401(p) applies to importation of fuel by truck.

HCI's contention in quoting the 79-3401(p) definition of "received" is that it includes only fuel manufacturers and pipeline

importers. According to HCI, when determining whether persons other than fuel manufacturers and pipeline importers, such as truck importers, are subject to the Kansas motor fuel tax, the ordinary meaning of received would apply. The ordinary meaning involves a transfer of possession to that person, and, because there is no transfer of possession to HCI in Kansas, it does not receive fuel within this state and is not liable for payment of the tax.

As the federal district court judge noted, in 2002 KDR introduced a fuel tax bill, SB 537. Among its proposals was one to amend the definition of received to add at the very end language that the fuel is received "in the case of imports, other than by pipeline, upon entry into this state" and another to replace the "distributor of the first receipt" language in what is now 79-3408(b) with the phrase "the incidence of the tax is imposed when the motor fuel is received." The proposed legislation was not enacted. Unenacted amendments to the motor-vehicle fuel tax law are no bases for deciding whether the fuel imported by HCI is received in this state. But the amendments' being suggested by KDR indicates that it recognized that the current statutory language may not expressly support its enforcement practices. There is no question, however, that KDR enforces the fuel tax against importers under an operative construction of the statute. See Performance Audit Report of KDR's Enforcement of Kansas Motor Fuels Tax by the Legislative Division of Post Audit, and Testimony on SB 537 of Secretary of Revenue, Stephen Richards.

Another argument raised by HCI is that interpreting the statutory definition so that "received" may mean the importation of motor-vehicle fuel into this state from any other state creates the possibility of impinging on the power to regulate commerce among the States, which is vested in Congress by Art. I, § 8, cl. 3 of the federal Constitution. However, we will not consider this issue since it is neither included in the certified question nor could it properly have been included in the certified question. The certification procedure is designed to allow this court to answer "questions of law of this state." K.S.A. 60-3201. The issue that was certified to this court does not include the question whether the Commerce Clause of the federal Constitution is implicated by the State's application

of its motor fuel tax law, and the purpose of the certification act would not be served by this court's considering a federal constitutional question.

Distributor/importer. HCI contends that the Act imposes the fuel tax only on distributors and that it is not liable for the fuel tax because it is an importer, not a distributor. The State's position is that HCI is liable for the fuel tax because the Act imposes the tax on importers as well as distributors, and, in any event, the statutory definition of distributor includes importers.

HCI's construction of the Act is grounded in its contention that the legal incidence of the tax is imposed by a single sentence of a single provision of the Act, the first sentence of K.S.A. 2005 Supp. 79-3408(b). It provides: "Unless otherwise specified in K.S.A. 79-3408c, and amendments thereto, the incidence of this tax is imposed on the distributor of the first receipt of the motor fuel and such taxes shall be paid but once."

HCI relies on *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 163 L. Ed. 2d 429, 126 S. Ct. 676 (2005), and *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 132 L. Ed. 2d 400, 115 S. Ct. 2214 (1995). The issue in the present case is not the same as that in *Prairie Band*, but the court's holding is instructive and the position taken by the Kansas Department of Revenue (KDR) in *Prairie Band* set the stage for consideration of the present case.

In *Prairie Band*, the Potawatomi Nation, wanting to sell motor fuel unburdened by upstream taxation, challenged imposition of the Kansas motor fuel tax on the non-Indian distributor that supplied fuel to the Potawatomi-owned gas station on reservation property. The Tenth Circuit Court of Appeals held that application of the Kansas tax to fuel received by a non-Indian distributor before being delivered to the Potawatomi station was invalid under the interest-balancing test of *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 65 L. Ed. 2d 665, 100 S. Ct. 2578 (1980). The Supreme Court reversed.

In the scheme for analyzing Indian tax immunity issues, "the 'who' and the 'where' of the challenged tax have significant consequences" and the " 'initial and frequently dispositive question

. . . is *who* bears the legal incidence of [the] tax.' " 546 U.S. at 101 (quoting *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458, 132 L. Ed. 2d 400, 115 S. Ct. 2214 [1995]). The first rule is that, absent congressional authorization, states are absolutely barred from placing the incidence of a tax on a tribe or on tribal members for sales made inside Indian country. *Chickasaw*, 515 U.S. at 458. Where a State asserts authority over the conduct of non-Indians engaging in activity on a reservation, competing interests are to be balanced. *Bracker*, 448 U.S. at 144. But the *Bracker* interest-balancing test does not apply where the State asserts its taxing authority over non-Indians off the reservation. The Supreme Court determined that, in Kansas' imposition of motor fuel tax on the non-Indian distributor of fuel for the Potawatomi gas station, the State was only asserting its taxing authority over non-Indians on non-tribal land. Thus, the motor fuel tax was not invalidated by Indian tax immunity because the incidence of the tax was not imposed on the Potawatomi. Dissenting justices disagreed that "Kansas' placement of the legal incidence of the fuel tax" is as "clear and certain as the State suggests and the Court holds." 546 U.S. at 119. Among the provisions cited by the dissenting justices was K.S.A. 2005 Supp. 79-3409, which authorizes distributors to pass on the tax to retailers. The majority, however, looked only at direct placement of the incidence of the tax.

With regard to placement of the incidence of the tax, the majority's position reflected that voiced by the State of Kansas at oral argument:

"JUSTICE O'CONNOR: Well, what event triggers, if you will, the incidence of the tax on the distributor?

"MR. OLSON: It's—

"JUSTICE O'CONNOR: Is it—is it the obligation—is it the minute the fuel is brought into Kansas? Is it when it is delivered to the distributor?

"MR. OLSON: It's—

"JUSTICE O'CONNOR: Or is it later?

"MR. OLSON: The statute explicitly says, Justice O'Connor—this is on page 2 of the petition—the incidence of this tax is imposed on the distributor of the first receipt of the motor fuel. And then Section—that's Section 3408(c)—Section 3410 then describes, in a little bit more detail, the physical operation of the reports that the distributor has to make, and the distributor has to pay the tax.

"JUSTICE O'CONNOR: So, the distributor gets the fuel and incurs the obligation at that point, whether or not it's resold.

"MR. OLSON: That's correct.

"JUSTICE GINSBURG: But doesn't incur it, or gets a credit or gets it back, if it sells to the United States or if it sells out-of-State. In other words, it's not just the receipt.

"MR. OLSON: It's—Justice Ginsburg, it is the receipt that triggers the liability for the tax."

"JUSTICE SCALIA: Aren't there usually two incidents? You talk about the incident of the taxes on a person, but it's also on an event. And what event is—in your—in your judgment is—

"MR. OLSON: Well, the statute could not be more clear, Justice Scalia. It is the receipt by the distributor of the fuel. That is what the statute says. It is as plain —

"JUSTICE STEVENS: But if the fuel—

"MR. OLSON:—as it could be."

HCI cites *Prairie Band* and *Chickasaw* for the proposition that an express statutory imposition of legal incidence of a tax is dispositive. In both *Prairie Band* and *Chickasaw*, the argument being made was that the legal incidence of the fuel tax fell on Indian retailers when the upstream taxpayers passed the cost through. In the absence of dispositive language in the Oklahoma motor fuel tax law, the Supreme Court in *Chickasaw* concluded that the legal incidence of the tax fell on the retailer rather than the distributor. 515 U.S. at 461. Distinguishing between the economic incidence and the legal incidence of the tax in *Prairie Band,* the Supreme Court rejected the argument, stating:

"Kansas law specifies that 'the incidence of the [the motor fuel] tax is imposed on the distributor of the first receipt of the motor fuel.' Kan. Stat. Ann. § 79-3408(c) (2003 Cum. Supp.). We have suggested that such 'dispositive language' from the state legislature is determinative of who bears the legal incidence of a state excise tax. *Chickasaw*, [515 U.S.], at 461. But even if the state legislature had not employed such 'dispositive language,' thereby requiring us instead to look to a 'fair interpretation of the taxing statute as written and applied,' *California Bd. of Equalization v. Chemehuevi Tribe*, 474 U.S. 9, 11, (1985) (*per curiam*), we would nonetheless conclude that the legal incidence of the tax is on the distributor.

"Kansas law makes clear that it is the distributor, *rather than the retailer*, that is liable to pay the motor fuel tax. Section 79-3410(a) (1997) provides, in relevant part, that '[e]very distributor . . . shall compute and shall pay to the direc-

tor . . . the amount of [motor fuel] taxes due to the state.' While the distributors are 'entitled' to pass along the cost of the tax to downstream purchasers, see § 79-3409 (2003 Cum. Supp.), they are not required to do so. In sum, the legal incidence of the Kansas motor fuel tax is on the distributor. The lower courts reached the same conclusion. 379 F.3d at 982 ('The Kansas legislature structured the tax so that its legal incidence is placed on non-Indian distributors'); 241 F. Supp. 2d, at 1311 ('[I]t is undisputed that the legal incidence of the tax is directed off-reservation at the fuel distributors'); see also *Sac and Fox Nation of Missouri v. Pierce*, 213 F.3d 566, 578 (C.A.10 2000) ('[T]he legal incidence of the [Kansas] tax law as presently written falls on the fuel distributors rather than on the Tribes'); *Winnebago Tribe of Nebraska v. Kline*, 297 F. Supp. 2d 1291, 1294 (Kan. 2004) ('Under the Kansas statutory scheme, the legal incidence of the state's fuel tax falls on the "distributor of first receipt" of such fuel'); *Sac and Fox Nation of Missouri v. LaFaver*, 31 F. Supp. 2d 1298, 1307 (Kan. 1998) ('[T]he statutes are extremely clear in providing that the tax in question is imposed upon the distributor'). And the Kansas Department of Revenue, the state agency charged with administering the motor fuel tax, has concluded likewise. See Letter from David J. Heinemann, Office of Administrative Appeals, to Mark Burghart, Written Final Determination in Request for Informal Conference for Reconsideration of Agency Action, *Davies Oil Co., Inc.*, Docket No. 01-970 (Jan. 3, 2002) (hereinafter Kansas Dept. of Revenue Letter) ('The legal incidence of the Kansas fuel tax rests with Davies, the distributor, who is up-stream from Nation, the retailer')." (Emphasis added.) 546 U.S. at 102-04.

In *Prairie Band*, the motor fuel retailer argued that the tax imposed on receipt of the fuel by distributors in fact was imposed on the retailer by being passed through from distributor to retailer. Thus, the question considered by the Supreme Court was whether the legal incidence of tax was imposed on the retailer or upstream of the retailer. The Supreme Court concluded that the legal incidence of the Kansas motor fuel tax fell on the upstream distributor.

The legislative history of K.S.A. 2005 Supp. 79-3408(b) supports the Supreme Court's conclusion. It shows that the provision "[u]nless otherwise specified in K.S.A. 79-3408c, and amendments thereto, the incidence of this tax is imposed on the distributor of the first receipt of the motor fuel" was added to the Act in 1998. L. 1998, ch. 96, sec. 2(c). According to the testimony of Shirley Klenda Sicilian, Director of Policy & Research for the Kansas Department of Revenue, the purpose of the provision was to distinguish between retailers and those upstream of retailers. The provision, according to Sicilian, was "intended to clarify that the legal

incidence of the motor fuel tax is on motor fuel distributors, not retailers, and not customers."

HCI's contention is that the naming of distributors and the absence of any mention of importers or manufacturers in the singled-out sentence means that the tax is not imposed on importers or manufacturers. What the Supreme Court and the legislative history elucidate is that the placement of the legal incidence of the motor fuel tax is on the distributor who is upstream from the retailer.

With HCI relying heavily on the first sentence of K.S.A. 2005 Supp. 79-3408(b), KDR directs the court's attention to the second sentence of the same subsection, which provides that "[s]uch tax shall be computed on all motor-vehicle fuels or special fuels received by each distributor, *manufacturer or importer* in this state and paid in the manner provided for herein." (Emphasis added.) KDR contends that the second sentence of subsection (b) plainly provides that importers as well as distributors are liable for the fuel tax. We disagree.

In *Prairie Band* the Supreme Court interpreted K.S.A. 79-3401 *et seq.* to clearly impose the motor fuel tax on the distributor of first receipt. The Supreme Court found K.S.A. 79-3408 to be clearly dispositive of that question. The Supreme Court further rejected the arguments made by the Prairie Band Potawatomi Nation that 79-3408(b) or any other provision of the motor fuel act altered their conclusion that the legal incidence of the Kansas motor fuel tax is on the distributor of first receipt.

The interpretation of a statute is a question of law over which this court has unlimited review. The fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme. Ordinary words are given their ordinary meanings. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. *O'Donoghue v. Farm Bureau Mut. Ins. Co.*, 275 Kan. 430, 66 P.3d 822 (2003). The right to tax must be strictly construed in favor of the taxpayer. "Tax statutes will not be extended by implication beyond the clear import of the language

employed therein, and their operation will not be enlarged so as to include matters not specifically embraced." *In re Tax Exemption Application of Kaul,* 261 Kan. 755, 766, 933 P.2d 717 (1997).

KDR argues we should apply the doctrine of operative construction and adopt KDR's interpretation of K.S.A. 79-3401 *et seq.* KDR proceeds to enumerate various rules of construction it has applied in construing the motor-fuel tax law to impose a fuel tax on importers as well as distributors. The problem with KDR's argument is that K.S.A. 79-3401 *et seq.* is neither uncertain nor ambiguous. The Act unambiguously specifies that the distributor of first receipt is liable for payment of the tax, and it is paid only once. The Act does not impose the fuel tax on any other entity. We need go no further to determine the legislative intent and must give effect to that intent as clearly expressed in 79-3408(b). Absent uncertainty or ambiguity the doctrine of operative construction is not applicable. KDR cannot ignore the plain and unambiguous language of the statute, nor, for that matter, can this court. Where a statute is plain and unambiguous we must give effect to the legislative intent as expressed. For that reason, we cannot give KDR's interpretation deference. As we previously noted, the Supreme Court in *Prairie Band* stated that even without the dispositive language of 79-3408(b), a fair interpretation of the taxing statute would lead it to the same conclusion. Further, the right to tax is penal in nature so that, where there is reasonable doubt as to the meaning of a taxing act, it will be construed most favorably to the taxpayer. *In re Tax Exemption Application of Kaul,* 261 Kan. at 766. Even if a reasonable doubt existed, a favorable interpretation to HCI would lead to the same conclusion. We do not agree with KDR that importers are included within the meaning of distributors for the purpose of the Act.

At the time it considered the Indian Tribes' motion for summary judgment, the federal district court concluded that HCI is not a distributor as that term is defined in 79-3401(f)(1): "The Winnebago Tribe cannot fall under (1) . . . since the fuel never comes to rest or storage in Kansas . . . ." The district court also noted that HCI's application to KDR for importer and distributor licenses was approved only as to an importer's license. With regard to the

State officials' position, which it did not adopt, the federal district court stated:

"The defendants point out that the critical 'distributor of first receipt' language in 79-3408(c) was only added in 1998 (1998 Kan. Sess. L., chapt. 96 § 2(c)), and argue that plaintiff's interpretation would imply that before that date the KMFTA would have the nonsensical result that no taxes would have been imposed on anyone. Rather, according to the legislative history submitted by defendants, this language was added merely to confirm that the tax should be imposed on distributors rather than retailers. Defendants point to the higher bond required of importers as opposed to distributors. K.S.A. 79-3403. And defendants point to K.S.A. [79]-3408(a) which provides that the tax is 'imposed on the use, sale or delivery of all motor vehicle fuels . . . used, sold or delivered in this state for any purpose whatsoever.' "

KDR contends that the federal district court's conclusion that HCI is not a distributor within the meaning of 79-3401(f)(1) is not binding on this court. The legal principle applicable in the present circumstances is the law of the case, which would continue in force a court's decision on a rule of law in subsequent stages of the same case. This court, however, has tended to sparingly apply the law of the case rule. In *State v. Finical*, 254 Kan. 529, 532, 867 P.2d 322 (1994), the discussion of the rule limited it to appealable orders. And in *State v. Collier*, 263 Kan. 629, Syl. ¶ 2, 952 P.2d 1326 (1998), the court stated that

"[t]he doctrine of the law of the case is not an inexorable command, or a constitutional requirement, but is, rather, a discretionary policy which expresses the practice of the courts generally to refuse to reopen a matter already decided, without limiting their power to do so. This rule of practice promotes the finality and efficiency of the judicial process."

In the present circumstances, where the district court's conclusion that HCI is not a distributor was reached in the same order that certified the question of HCI's tax liability to this court, no finality or efficiency is lost by this court's reconsidering the matter. But, upon reconsideration, this court has no reason to reach any conclusion different from the federal district court because no additional insight or authority has been brought to this court's attention.

KDR urges the court to take into consideration subsection (4), in addition to subsection (1), of the 79-3401(f) definition of distributor. K.S.A. 79-3401(f)(4) defines distributor as any person who

"received and, in any manner, uses, sells or delivers motor-vehicle fuels or special fuels in the state of Kansas on which the tax provided for in this act has not been previously paid." Subsection (f)(4) appears to be a catch-all provision ensuring that someone will be deemed the distributor and the tax will be paid in a transaction not involving a distributor as defined in subsections (f)(1) through (3). The federal district court concluded that HCI did not come within subsection (f)(4) because it does not purchase or receive fuel within the state of Kansas, and we agree.

Receipt is not defined in the Act as it relates to importing of motor fuel by truck. Thus in that regard, receipt is to be given its ordinary meaning. We agree with HCI that receipt involves the transfer of possession or control from one party to another party. The ordinary meaning of receipt "requires delivery or change of possession from the seller to the buyer . . . [t]aking physical possession of goods." Black's Law Dictionary 1268 (6th ed. 1990). Webster Third New International Dictionary defines receipt as "3: the act or process of receiving . . . 4: something (as food, goods, money) that is received." There was no delivery or receipt when HCI's fuel truck crossed the Kansas state line. Delivery and receipt of the fuel occurred later at the tribal gas stations.

We interpret K.S.A. 79-3401 *et seq.* to impose the legal incidence of tax upon the distributor of first receipt of the motor fuel. We have concluded that HCI is not a distributor and it did not receive the motor fuel in Kansas. We therefore hold that under the facts submitted by the certifying court, the answer to the certified question is no.

LUCKERT, J., not participating.
BUSER, J., assigned.