No. 105,098

Jacob Carl Rodewald, *Appellant/Cross-appellee*, v. Kansas Department of Revenue, *Appellee/Cross-appellant*.

(297 P.3d 281)

Opinion filed March 22, 2013.

*Michael C. Hayes*, of Oskaloosa, argued the cause and was on the briefs for appellant/cross-appellee.

*J. Brian Cox*, of legal services bureau, Kansas Department of Revenue, argued the cause and was on the brief for appellee/cross-appellant.

The opinion of the court was delivered by

Johnson, J.: Jacob C. Rodewald appeals from the district court's summary judgment in favor of the Kansas Department of Revenue (KDR), upholding the suspension of Rodewald's Kansas driver's license. The basis for the suspension was K.S.A. 8-1567a, which prohibits any person less than 21 years of age from operating a vehicle in this state with a breath or blood alcohol content (BAC) of .02 or greater and which provides for a driver's license suspension if the test results are greater than .02, but less than .08. Rodewald contends that because he is an enrolled member of the

Prairie Band Potawatomi Nation and was operating a vehicle on the reservation when stopped by a tribal officer, the tribal court had exclusive jurisdiction over any civil matter arising from the incident, and the KDR acted outside the scope of its authority. We agree. The grant of summary judgment is reversed, and the matter is remanded to the district court with directions to order the reinstatement of Rodewald's driver's license.

## Factual and Procedural Overview

On April 26, 2008, Prairie Band Potawatomi Nation (Nation) Police Officer John Hurla stopped Rodewald's vehicle for driving recklessly. At all relevant times, Rodewald was operating his vehicle within the boundaries of the Nation's reservation. After making contact with Rodewald, Officer Hurla initially detected a slight odor of an alcoholic beverage coming from inside of the vehicle, but later determined the alcohol smell was coming from Rodewald's person. Upon inquiry, Rodewald said that he had consumed a beer with a friend and also admitted that he was only 18 years old.

Officer Hurla arrested Rodewald for violating provisions of the Nation's Law and Order Code (Tribal Code), including that code's driving under the influence section. The Tribal Code contains an implied consent provision that authorizes tribal officers to test anyone who "operates a motor vehicle upon the public highways within the [Nation's] jurisdiction." Potawatomi Law and Order Code, Section 17-4-14 (2008). Under that section, the tribal officer is authorized to administer the test "only after placing such person under arrest and informing the person that he or she is or will be charged with the offense of driving or being in actual physical control of a vehicle upon the public highways while under the influence of intoxicating liquor or any drug." Potawatomi Law and Order Code, Section 17-4-14(A). Rodewald submitted to a breath test on which he scored an alcohol content of .046.

Inexplicably, Officer Hurla completed and mailed KDR's form DC-28, which is required by *Kansas* law to certify a test result by a person less than 21 years of age who scores .02 or greater but less that .08 on an alcohol breath test. See K.S.A. 8-1567a(d). The

form includes Officer Hurla's certification of the test result and his acknowledgment that he provided Rodewald with all notices required by Kansas' implied consent law. See K.S.A. 2007 Supp. 8-1001; K.S.A. 8-1567a(d) (identifying the oral and written notices required under those sections). The form also recited that Rodewald was operating his vehicle in Jackson County, Kansas, albeit the KDR does not appear to argue that the Nation's reservation is a part of Jackson County.

Rodewald properly requested and was given an administrative hearing, which was held in Shawnee County. The hearing officer affirmed the administrative suspension of Rodewald's license for violating 8-1567a, but also noted that Rodewald had raised the issue of subject matter jurisdiction. Specifically, Rodewald argued that the KDR did not have jurisdiction over the proceedings because K.S.A. 8-1567a only prohibits the operation or attempt to operate a motor vehicle while under the influence "in this state," and Rodewald was operating his motor vehicle entirely within the sovereign boundaries of the Nation's reservation.

Rodewald then filed a timely petition for judicial review of the suspension order. Both parties filed motions for summary judgment and related responses. Although multiple issues were raised, the district court recited the following in the issues section of its memorandum decision:

> "It would seem to the Court while the Petitioner, Rodewald, lists four separate issues and the Department of Revenue only looks at one issue, they both agree on what the Court sees as the sole issue in this case.
>
> "That issue is if the administrative action taken by the Kansas Department of Revenue pursuant to [K.S.A. 8-1567a] is valid for a Native American Indian driver who is operating a motor vehicle solely within the boundaries of a federally recognized Indian Reservation of which the driver is a member while being stopped by a Tribal Police Officer.
>
> "In plain English, it comes down to whether the action of the Native American driver on a reservation after being stopped by a Tribal Officer can be used against him in an administrative hearing which is completely removed from the Prairie Band Potawatomi Nation. The Plaintiff believes the actions did not arise within this 'state' as the PBPT is a sovereign nation."

Then, applying the familiar summary judgment standard, the district court granted summary judgment in favor of KDR noting:

"This case is close for either side. In reading the case decisions put forth by both of the parties it is apparent to the Court most of the time the Courts have sided with the [PBPN] as being a sovereign entity. As a sovereign entity they are not considered part of the State of Kansas. However, the Court is very much aware of the competing issues in this case and the importance of the State's interest in keeping impaired and drunk drivers off the road. When looking at the State's interests in keeping the motoring public of the entire state safe the Court must find it has preference to the welfare of the tribe and/or the tribes right to self govern.

"The Court affirms the action of the State and denies the Plaintiff's petition."

Rodewald subsequently filed a timely notice of appeal. KDR filed a timely cross-appeal of the district court's determination that the Nation's reservation was "not considered part of the State of Kansas." Pursuant to K.S.A. 20-3018(c), this court transferred the appeal from the Court of Appeals.

## STATUTORY INTERPRETATION OF K.S.A. 8-1567a

The parties present us with the opportunity to become immersed in documents outside our own statutes, such as the 1861 Act for the Admission of Kansas into the Union, Congress' 1953 enactment of Public Law 280 and its 1968 amendments thereto, or the Potawatomi treaties with the United States government in 1846, 1861, and 1867. But KDR's authority to suspend Rodewald's license emanates from K.S.A. 8-1567a, and our inquiry necessarily begins with that statute's language:

"(a) It shall be unlawful for any person less than 21 years of age to operate or attempt to operate a vehicle in this state with a breath or blood alcohol content of .02 or greater.

"(b) Whenever a law enforcement officer determines that a breath or blood alcohol test is to be required of a person less than 21 years of age pursuant to K.S.A. 8-1001 or K.S.A. 8-2,142 and amendments thereto, in addition to any other notices required by law, the law enforcement officer shall provide written and oral notice that: (1) It is unlawful for any person less than 21 years of age to operate or attempt to operate a vehicle in this state with a breath or blood alcohol content of .02 or greater; and (2) if the person is less than 21 years of age at the time of the test request and submits to and completes the test or tests and the test results show an alcohol concentration of .02 or greater, but less than .08, on the person's first occurrence, the person's driving privileges will be suspended for 30 days and on the person's second or subsequent occurrence, the person's driving privileges shall be suspended for one year.

"(c) Any suspension and restriction of driving privileges pursuant to this section shall be in addition to any disqualification from driving a commercial motor vehicle pursuant to K.S.A. 8-2,142 and amendments thereto.

"(d) Whenever a breath or blood alcohol test is requested pursuant to K.S.A. 8-1001 and amendments thereto, from a person less than 21 years of age, and results in a test result of .02 or greater, but less than .08, a law enforcement officer's certification under this section shall be prepared. The certification required by this section shall be signed by one or more officers to certify that:

(1)(A) There existed reasonable grounds to believe the person was operating a vehicle while under the influence of alcohol or drugs, or both, or to believe that the person had been driving a commercial motor vehicle, as defined in K.S.A. 8-2,128 and amendments thereto, while having alcohol or other drugs in such person's system; (B) the person had been placed under arrest, was in custody or had been involved in a vehicle accident or collision; (C) a law enforcement officer had presented the person with the oral and written notice required by K.S.A. 8-1001 and amendments thereto, and the oral and written notice required by this section; (D) that the person was less than 21 years of age at the time of the test request; and (E) the result of the test showed that the person had an alcohol concentration of .02 or greater in such person's blood or breath.

(2) With regard to a breath test, in addition to those matters required to be certified under subsection (d)(1), that: (A) The testing equipment used was certified by the Kansas department of health and environment; (B) the testing procedures used were in accordance with the requirements set out by the Kansas department of health and environment; and (C) the person who operated the testing equipment was certified by the Kansas department of health and environment to operate such equipment.

"(e) If a hearing is requested as a result of a law enforcement officer's certification under this section, the scope of the hearing shall be limited to whether: (1) A law enforcement officer had reasonable grounds to believe the person was operating a vehicle while under the influence of alcohol or drugs, or both, or to believe that the person had been driving a commercial motor vehicle, as defined in K.S.A. 8-2,128 and amendments thereto, while having alcohol or other drugs in such person's system; (2) the person was in custody or arrested for an alcohol or drug related offense or was involved in a motor vehicle accident or collision resulting in property damage, personal injury or death; (3) a law enforcement officer had presented the person with the oral and written notice required by K.S.A. 8-1001 and amendments thereto, and the oral and written notice required by this section; (4) the testing equipment used was reliable; (5) the person who operated the testing equipment was qualified; (6) the testing procedures used were reliable; (7) the test result determined that the person had an alcohol concentration of .02 or greater in such person's blood or breath; (8) the person was operating a vehicle; and (9) the person was less than 21 years of age at the time a test was requested.

"(f) If a person less than 21 years of age submits to a breath or blood alcohol test requested pursuant to K.S.A. 8-1001 or K.S.A. 8-2,142 and amendments thereto, and produces a test result of .02 or greater, but less than .08, on the person's first occurrence, the person's driving privileges shall be suspended for 30 days and then restricted as provided by K.S.A. 8-1015, and amendments thereto, for an additional 330 days, and on the person's second or subsequent occurrence, the person's driving privileges shall be suspended for one year.

"(g) Except where there is a conflict between this section and K.S.A. 8-1001 and 8-1002 and amendments thereto, the provisions of K.S.A. 8-1001 and 8-1002 and amendments thereto, shall be applicable to proceedings under this section.

"(h) Any determination under this section that a person less than 21 years of age had a test result of .02 or greater, but less than .08, and any resulting administrative action upon the person's driving privileges, upon the first occurrence of such test result and administrative action, shall not be considered by any insurance company in determining the rate charged for any automobile liability insurance policy or whether to cancel any such policy under the provisions of subsection (4)(a) of K.S.A. 40-277 and amendments thereto." K.S.A. 8-1567a.

## Standard of Review

Our standard and accompanying rules for reviewing summary judgments is well settled:

" 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]' *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009)." *Scott v. Hughes*, 294 Kan. 403, 411, 275 P.3d 890 (2012).

Here, we will need to interpret and construe statutory provisions, which presents a question of law subject to de novo review. See *Hughes*, 294 Kan. at 412.

## Analysis

Rodewald argues simply that the state of Kansas has no civil jurisdiction over the conduct of a Native American while on his or

her tribe's reservation. Accordingly, he asks for a dismissal of the administrative proceedings because KDR lacked jurisdiction to sanction him for his driving on the reservation.

The KDR's brief, on the other hand, contains considerable more detail. It sets forth KDR's response to the petitioner's statement of the nature of the case; a response to petitioner's statement of facts; a response to petitioner's statement of the issue; a response to petitioner's statement of the standard of review; and a response and rebuttal to petitioner's arguments and authorities. The brief also shares KDR's additional statement of facts, additional standards, and an alleged limitation of issues, before setting forth KDR's own arguments and authorities, which touch on several fronts. Utilizing our best efforts at distilling those arguments into a workable format, we discern that the KDR is relying on three bases of jurisdiction to suspend Rodewald's Kansas driver's license: (1) K.S.A. 8-1567a did not require the KDR to prove that Rodewald was driving within the state of Kansas in order to suspend his Kansas license for driving with a BAC greater than .02; (2) the Nation's reservation is within the state of Kansas; and/or, (3) the KDR's "very real interest . . . in combating drunk driving" invests it with jurisdiction as a matter of public policy to suspend a Kansas driver's license for conduct occurring on the Nation's reservation. We address each basis in turn.

*KDR jurisdiction to suspend is without geographical limitation*

KDR recites the applicable provision of our implied consent law which sets forth the parameters of the deemed consent:

"Any person who operates or attempts to operate a vehicle *within this state* is deemed to have given consent, subject to the provisions of this act, to submit to one or more tests of the person's blood, breath, urine or other bodily substance to determine the presence of alcohol or drugs." (Emphasis added.) K.S.A. 2007 Supp. 8-1001(a).

Likewise, the agency acknowledges that the statute under which it suspended Rodewald's driver's license specifies a geographical or jurisdictional limitation, to-wit: "It shall be unlawful for any person less than 21 years of age to operate or attempt to operate a vehicle *in this state* with a breath or blood alcohol content of .02 or

greater." (Emphasis added.) K.S.A. 8-1567a(a). But KDR contends that *Furthmyer v. Kansas Dept. of Revenue*, 256 Kan. 825, 888 P.2d 832 (1995), instructs us that K.S.A. 8-1001(a) contains merely prefatory language that does not in any way limit the provisions found elsewhere in the implied consent law. Therefore, KDR believes that its authority to suspend a driver's license under K.S.A. 8-1567a(f) is not limited to persons driving in Kansas. We cannot discern such a lesson from *Furthmyer's* holding.

In *Furthmyer*, a police officer observed a vehicle sitting at a stop sign for an inordinate amount of time. Upon approaching the vehicle, the officer found Furthmyer slumped over the steering wheel, either asleep or passed out, with his foot on the brake while the vehicle was running and in gear with the vehicle's headlights illuminated. Furthmyer effectively refused a breath test with an insufficient sample, and the KDR suspended his driver's license for 1 year for that test refusal. Upon appeal of the suspension, Furthmyer did not challenge the fact that the police officer had reasonable grounds to believe that Furthmyer was operating or attempting to operate his vehicle while under the influence of alcohol. Rather, Furthmyer argued that the KDR had to go one step further and prove that the police officer's belief was accurate, *i.e.*, Furthmyer was actually operating or attempting to operate the vehicle.

First, the *Furthmyer* court reiterated that the purpose of the implied consent law is to coerce a driver's submission to chemical testing through the threat of statutory penalties, including license revocation for refusing the test, and that the mandatory language of K.S.A. 8-1001(b) required the law enforcement officer to request testing. 256 Kan. at 835. Then, the court pointed out that K.S.A. 8-1002(h)(1) (Furse 1991) limited the issues which could be considered in refusal cases and noted that a determination of actual operation or attempted operation was not a listed issue. 256 Kan. at 835. Pointedly, the *Furthmyer* holding relied in part on the fact that K.S.A. 8-1002(h)(2) (Furse 1991), which applies to chemical test *failure* cases, specifically listed the question of whether the licensee was actually operating a vehicle. Therefore, the *Furthmyer*

court opined a legislative intent to treat test refusal cases differently than test failure cases, so that

"when a blood alcohol test is refused, the KDR need only prove a law enforcement officer had reasonable grounds to believe the person was operating or attempting to operate a motor vehicle while under the influence of alcohol or drugs and not that the person had actually operated or attempted to operate the motor vehicle." 256 Kan. at 836.

*Furthmyer* is obviously factually distinguishable. We are not presented with a test refusal here; this is a test failure case. Indeed, KDR could not have suspended Rodewald's license under K.S.A. 8-1567a(f) unless he had submitted to a breath or blood alcohol test, because the touchstone for suspension under that provision is a *test result* of .02 or greater. Further, Furthmyer's vehicle was obviously located within this state and in a location where the arresting officer had jurisdiction to enforce Kansas law. The issue in *Furthmyer*—whether the licensee was actually operating or attempting to operate the vehicle—is not germane here because Rodewald was unquestionably operating his vehicle when detained by the tribal officer.

But more importantly, we do not agree with KDR's assertion that *Furthmyer* treated the language of K.S.A. 8-1001(a) as being merely precatory and, therefore, ineffectual to limit any of the other provisions of the implied consent law. K.S.A. 2007 Supp. 8-1001(a) expresses a clear legislative directive that the implied consent law will apply to "[a]ny person who operates or attempts to operate a vehicle within this state" and that it is those persons who are "deemed to have given consent" to being tested for alcohol or drugs. See *Double M Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 271, 202 P.3d 7 (2009) (when statute plain and unambiguous, appellate court does not speculate as to legislative intent behind it and will not read something into the statute not readily found there). *Furthmyer* did not purport to expand the persons subject to the implied consent law beyond those meeting the 8-1001(a) definition. Rather, that case merely clarified the proof necessary to establish a test refusal for a person who was alleged to have operated or attempted to operate a vehicle within this state.

Further, K.S.A. 2008 Supp. 8-1001(a) does not state that the implied consent is restricted to those who possess a Kansas driver's license. Therefore, if one accepts the KDR's argument that its authority to suspend a driver's license is not limited to those persons driving within this state, it could arguably suspend the Alaskan driver's license of an 18-year-old Alaskan resident who was driving on an Alaskan highway with an alcohol content greater than .02. Obviously, that construction is nonsensical. See *Herrell v. National Beef Packing Co.*, 292 Kan. 730, 745, 259 P.3d 663 (2011) (statutes construed to avoid unreasonable results). Moreover, the legislature knows how to specifically address the authority of KDR to suspend or revoke a license based on conduct occurring outside of this state. See K.S.A. 8-252 (suspension or revocation of resident's license upon conviction in another state); K.S.A. 8-1219 (nonresident violator compact). Those specific out-of-state conduct provisions are inapplicable here. Accordingly, we must find that the legislature meant what it said; the implied consent law—and all of its provisions—applies only to those who operate or attempt to operate a vehicle within this state.

More specifically, the type of unlawful conduct for which KDR suspended Rodewald's driver's license must occur in Kansas pursuant to the plain language of K.S.A. 8-1567a(a), which makes it a crime for a person under age 21 to "operate or attempt to operate a vehicle in this state with a breath or blood alcohol content of .02 or greater." Rodewald's suspension was effected under subsection (f) of that same statute. A harmonious reading of the entire statute convinces us that the legislature intended the person subject to suspension under subsection (f) to have been operating within this state, pursuant to the proscription in subsection (a). See *Redd v. Kansas Truck Center*, 291 Kan. 176, 195, 239 P.3d 66 (2010) (an act is construed as a whole; various provisions of act considered in pari materia to bring into workable harmony). In other words, the "in this state" limitation is a condition precedent to suspension under K.S.A. 8-1567a(f).

Finally, we briefly address KDR's argument that K.S.A. 8-1501 provides that the provisions of K.S.A. 8-1566 to K.S.A. 8-1568, inclusive, are applicable "upon highways and elsewhere throughout

the state." The argument appears to be that KDR has jurisdiction over conduct on any public highway anywhere because such roads are publicly maintained and not private property. Such logic does not comport with the fact that the Nation has the authority to enforce tribal law on the roadways within its reservation, publicly maintained or otherwise. KDR's jurisdiction over highways does not extend beyond those highways which are situated within this state, *i.e.*, those highways over which a Kansas law enforcement officer would have jurisdiction.

### *Location of the Nation's reservation*

KDR contends that if we find that it can only impose a K.S.A. 8-1567a(f) suspension upon someone who has operated or attempted to operate a vehicle in this state, then we should find that the Nation's reservation is within this state. KDR points out that the reservation is circumscribed by the outer boundary lines of this state, placing the reservation's physical location entirely within this state.

But Rodewald argues that the Nation's reservation, which was established by treaty with the federal government in 1846, was specifically excepted from the Kansas boundaries in the Act for the Admission of Kansas into the Union in 1861, which recited in part:

"[N]othing contained in the said constitution respecting the boundary of said state shall be construed to impair the rights of person or property now pertaining to the Indians of said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with such Indian tribe, is not, without the consent of such tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries, and constitute no part of the state of Kansas, until said tribe shall signify their assent to the president of the United States to be included within said state, or to affect the authority of the government of the United States to make any regulation respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been competent to make if this act had never passed." 12 Stat. 126, ch. 20 § 1 (Jan. 29, 1861); K.S.A. Kan. Const. vol., p. 9 (1988).

KDR counters by pointing to cases in which reservation lands have been found to be within this state for purposes of state taxation. See, *e.g.*, *Sac and Fox Nation of Missouri v. Pierce*, 213 F.3d

566, 577 (10th Cir. 2000) ("only those lands which Indian tribes reserved unto themselves 'by treaty' with the United States" were exempted from the boundaries of Kansas); *United States v. Ward*, 28 F. Cas. 397, 399 (D. Kan. 1863) ("all territory which was not covered by such treaties was included within the state, within its jurisdiction and within its territory"); *In re Tax Grievance Application of Kaul*, 269 Kan. 181, 187, 4 P.3d 1170 (2000) (*Kaul II*) (allowing Kansas to impose ad valorem taxes on individually owned land on the reservation). But *cf. In re Tax Exemption Application of Kaul*, 261 Kan. 755, 769, 933 P.2d 717 (1997) (*Kaul I*) ("plain meaning [of Act for Admission] appears more reasonably to state that all Indian land was to be excluded from the boundaries of the state and not subject to taxation, unless it was specifically included by treaty or an act of Congress"). Pointing to a Kansas Bar Journal article written by a deputy attorney general, Miller, *Tribal v. State Government: Drawing the Lines*, 70 J.K.B.A. 24, 25 (Jan. 2001), KDR contends our conflicting decisions should be resolved by declaring that *Kaul I* was incorrectly decided and that the Nation's reservation is within the boundaries of this state. We decline the invitation.

Here, the State is not attempting to tax property. Rather, the KDR is performing a regulatory function through a civil action. Generally, a state has no civil or criminal jurisdiction over tribal members unless Congress has expressly said so. See *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207, 107 S. Ct. 1083, 94 L. Ed. 2d 244 (1987) ("state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided"). "The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history." *Rice v. Olson*, 324 U.S. 786, 789, 65 S. Ct. 989, 89 L. Ed. 1367 (1945). This policy stems from the concept of federal preemption, which is undermined if states are allowed to assert control. See *Worcester v. Georgia*, 31 U.S. 515, 561, 8 L. Ed. 483 (1832) ("[State intervention is] repugnant to the constitution, laws and treaties of the United States. They interfere forcibly with the relations established between the United States and the Cherokee nation, the regulation

of which . . . are committed exclusively to the government of the union.").

But states have not been denied all regulatory authority on tribal lands. See *Nevada v. Hicks*, 533 U.S. 353, 361, 121 S. Ct. 2304, 150 L. Ed. 2d 398 (2001) ("[T]he Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. State sovereignty does not end at a reservation's border. Though tribes are often referred to as 'sovereign' entities, it was 'long ago' that 'the Court departed from Chief Justice Marshall's view that 'the laws of [a State] can have no force' within reservation boundaries.").

In 1953, Congress enacted Public Law 280, which granted six states broad criminal and limited civil adjudicatory jurisdiction over private disputes over all tribal lands within each designated state. 18 U.S.C. § 1162 (2006); 28 U.S.C. § 1360 (2006). Essentially, P.L. 280 authorized the transfer to those six states of the federal government's jurisdiction over tribes to prosecute crimes and handle other private civil affairs. At the time P.L. 280 was enacted, Congress also granted the remaining states authority to assume civil and criminal jurisdiction over the tribes within their respective states. That power, however, was limited by a 1968 Amendment requiring approval of the tribe before the state could assume jurisdiction. Before the amendment, nine additional states—Nevada, Idaho, Iowa, Washington, South Dakota, Montana, North Dakota, Arizona, and Utah—assumed jurisdiction in at least some form over the tribes within their respective states. Garrison, *Baffling Distinctions Between Criminal and Regulatory: How Public Law 280 Allows Vague Notions of State Policy to Trump Tribal Sovereignty*, 8 J. Gender Race & Justice 449, 456 (Fall 2004).

The remaining 35 states—including Kansas—fall under the general rule that they must obtain the express permission of the tribe or the federal government before they may assert jurisdiction over tribal members or land. Congress has granted the state of Kansas criminal jurisdiction "over offenses committed by or against Indians on Indian reservations." 18 U.S.C. § 3243 (2006). That provision has been interpreted as meaning that "Kansas has jurisdiction over non-major state offenses committed by or against Indians on Indian reservations located in the State of Kansas." *Iowa Tribe of*

*Indians v. State of Kan.*, 787 F.2d 1434, 1440 (10th Cir. 1986). But there is no similar provision for civil matters. See *Burdett v. Harrah's Kansas Casino Corp.*, 260 F. Supp. 2d 1109, 1116-17 (D. Kan. 2003) (18 U.S.C. § 3243 does not authorize civil claims).

KDR concedes that Kansas is not a P.L. 280 state and has not been granted civil jurisdiction over causes of action involving tribal members on their reservation. But the agency suggests that an administrative suspension of a person's driver's license is not a "cause of action" within the meaning of P.L. 280. Further, KDR argues that state jurisdiction in this case has not been preempted by federal law, because the state law is compatible with and does not interfere with the federal and tribal interests. But its reliance on *Cabazon* to make that point is suspect, given that California is a P.L. 280 state that has been granted civil jurisdiction. Nevertheless, even in P.L. 280 states, the inquiry into federal preemption "is to proceed in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development." *Cabazon*, 480 U.S. at 216.

But in this opinion, we need not determine whether the state of Kansas is precluded from ever exercising civil regulatory authority over a tribal member's conduct while on the Nation's reservation. The matter is governed by statute and our reading of the Kansas implied consent laws in general, and K.S.A. 8-1567a in particular, convinces us that the phrases "within this state" and "in this state" were not meant to include the operation of vehicles on Native American reservations or on any other land over which a Kansas law enforcement officer has no jurisdiction, such as military posts. That holding ends our inquiry because "[a]ny authority claimed by an agency or board must be conferred in the authorizing statutes either expressly or by clear implication from the express powers granted." *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs*, 290 Kan. 446, 455, 228 P.3d 403 (2010).

As noted, K.S.A. 2007 Supp. 8-1001(a) declares that any person operating or attempting to operate a vehicle within this state is deemed to have consented to being tested for alcohol or drugs.

The next subsection addresses the requirement placed on law enforcement officers, directing, in relevant part, that

"[a] law enforcement officer *shall request* a person to submit to a test or tests deemed consented to under subsection (a): [I]f the officer has reasonable grounds to believe the person was operating or attempting to operate a vehicle while . . . under the age of 21 years while having alcohol or other drugs in such person's system,"

and the person was either under arrest or in custody for the alcohol-related offense or had been in an accident resulting in damage or injury. (Emphasis added.) K.S.A. 2007 Supp. 8-1001(b). Then, before the test is administered, the person must be given the oral and written notices set forth in K.S.A. 2007 Supp. 8-1001(f). See *State v. Luft*, 248 Kan. 911, Syl. ¶ 1, 811 P.2d 873 (1991) (notice provisions of 8-1001(f) mandatory, not merely directory). If K.S.A. 8-1567a is applicable, subsection (b) of that statute speaks to a breath or blood alcohol test being *"required"* pursuant to K.S.A. 2007 Supp. 8-1001 and mandates that the law enforcement officer give additional written and oral notices.

Obviously, the explanatory oral and written notices play a significant role in our system of implied consent, because the failure to give them leads to the suppression of the results of the test to which the operator was deemed to have consented. *Luft*, 248 Kan. 911, Syl. ¶ 2. But a law enforcement officer of another jurisdiction, such as a military policeman on Fort Riley or a tribal officer on the Potawatomi reservation, is not bound by the mandates of the Kansas statutes requiring a request for testing in certain circumstances and requiring the giving of written and oral notices before testing, even if they might be aware of such Kansas requirements. KDR does not explain how the requirement to request testing or to give oral and written notices prior to testing can be enforced against law enforcement officers who are not within this state's jurisdiction, or why the legislature would purport to place such requirements on persons over whom it has no authority.

Continuing with the provisions of K.S.A. 8-1567a, the next step for law enforcement officers is to prepare and sign a certification. K.S.A. 8-1567a(d). One or more officers must certify to the existence of facts necessary to give rise to the deemed consent; to the

giving of the required notices; to the person being under age 21; and to the results of the testing being .02 or greater. Again, KDR does not explain why the legislature would expect out-of-state law enforcement officers to make such certifications, when not legally required to do so. Indeed, how would Kansas have even known that Rodewald failed the test on the reservation if the tribal officer had not gratuitously sent the certification to Kansas? Even if we grant KDR jurisdiction, it could not exercise it consistently without an enforceable certification requirement. See *Herrell*, 292 Kan. at 745 (courts presume that legislature does not intend to enact meaningless legislation).

Perhaps more importantly for this discussion, if a breath test is utilized, the law enforcement officers must certify:

"(A) The testing equipment used was certified by the Kansas department of health and environment; (B) the testing procedures used were in accordance with the requirements set out by the Kansas department of health and environment; and (C) the person who operated the testing equipment was certified by the Kansas department of health and environment to operate such equipment." K.S.A. 8-1567a(d)(2).

Obviously, these safeguards cannot be met if the law enforcement agency involved in the arrest and testing of a vehicle operator is not regulated, certified, or licensed by the Kansas Department of Health and Environment. In other words, this portion of the law clearly contemplates that the arresting officer will be a Kansas law enforcement officer.

Consequently, to employ a harmonious and consistent construction of the entire implied consent act, one must interpret the phrases "within this state" and "in this state" to mean within the jurisdiction of a Kansas law enforcement officer. That definition would not include the roadways—either public or private—within the Nation's reservation over which its tribal police have assumed jurisdiction to enforce tribal law. In short, KDR did not have statutory authority to sanction Rodewald for violating K.S.A. 8-1567a, and its suspension of his driver's license must be vacated.

*Public policy jurisdiction*

Finally, KDR plays the public interest card, suggesting that we can grant jurisdiction in this case simply to allow it to perform its perceived function of combating drunk driving. One might question whether the public policy interest involved here belongs to the Nation, given that its laws provide for revoking driving privileges on the reservation. Nevertheless, the Court of Appeals recently answered the public policy argument quite succinctly: "A state court cannot confer jurisdiction upon itself for public policy reasons." *Bradley v. Bear*, 46 Kan. App. 2d 1008, 1018, 272 P.3d 611 (2012). No matter how noble it believes its mission to be, the KDR must derive its subject matter jurisdiction from statutory authority. That authority simply does not exist here.

Accordingly, we reverse the district court's grant of summary judgment in favor of the KDR and remand with directions to reinstate Rodewald's driver's license.

Reversed and remanded with directions.